UTAH MINING AND MANUFACTURING COM-
PANY, APPELLANT, v. DICKERT AND MYERS
SULPHUR COMPANY, RESPONDENT.

TREATIES—PUBLIC LANDS—CHIPPEWA SCRIP—The treaty with the
Chippewas of Lake Superior, dated September 30th, 1854, pro-
vided in the seventh clause of the second article, that each head
of a family, or single person over twenty-one years of age, at
that time, of the mixed bloods belonging to the Chippewas of
Lake Superior, should be entitled to eighty acres of land, to be
selected by them under the direction of the President of the
United States; to be secured to them by patent in the usual form.
A certificate for eighty acres of land was thereafter issued to C.
Thereupon C. located said scrip on seventy-nine and eighty two
one-hundredths acres of land in Utah, and a patent therefor
was, on the 10th day of October, 1870, issued to C; held, that
such patent was rightfully issued, and that the treaty-making
power of the United States has authority to dispose of the public
domain without the consent of or ratification by Congress.

ID.—ID.—ID.—RATIFICATION BY CONGRESS.—In 1871 the Secretary
of the Interior, in accordance with a resolution of the House,
transmitted to that body a report of the grants under this
treaty, among which appears the grant in question, as well as
other matters connected with land certificates issued under the
treaty; and thereafter, on June 8th, 1872, Congress passed an
act requiring the Secretary of the Interior to " permit the
purchase with cash or military bounty land warrants of such
lands as may have been located with claims arising under the
seventh clause of the second article of the treaty of September
30, 1854, at such price per acre as he deemed equitable and
proper;" held, that such action of Congress was a ratification of
the action of the executive officers in theretofore issuing patents
for lands located with the land certificates under the seventh
clause of the second article of the treaty, if such ratification was
necessary.

MINING CLAIMS—PRINCIPAL AND AGENT—ADVERSE POSSESSION—
When the agent of the plaintiff located a valid mining claim for
plaintiff, and did the assessment work for the five succeeding
years, and received pay from plaintiff therefor, and early in the
sixth year (1882) resigned his agency and took adverse possession
of said premises, and while so holding adversely did the assess-
ment work for the three succeeding years on his own behalf;

and thereupon (1885) executed a quit claim deed to the defendant company, which said defendant held adverse possession thereafter until June 9th, 1888, where the plaintiff company did not know of such adverse possession, a finding that in 1882 the plaintiff company abandoned the mining claim and omitted thereafter to do the assessment work, is contrary to the evidence.

ID.—ADVERSE POSSESSION—ASSESSMENT WORK.—Where adverse possession of a mining claim is taken and held wrongfully, the rightful owner or locator is excused from doing the assessment work during the continuance of such adverse holding.

APPEAL from a judgment and from a motion refusing a new trial of the district court of the second district. The opinion states the facts.

*Messrs. Bennett, Kirkpatrick & Bradley* and *Mr. W. H. Dickson,* for the appellant.

*Messrs. Hall & Marshall* and *Mr. Arthur Brown* for the respondent.

JUDD, J.:

This is an action of ejectment begun in Beaver county, of this territory, upon a complaint which claims that the plaintiff below, appellant here, is the owner of all of lots 3 and 4, of section 7, in township 26 south, of range 6 west, Salt Lake base meridian, containing seventy-nine and eighty-two one-hundredths acres; and the complaint alleges that while plaintiff was the owner and so seized, and in and entitled to the possession of said land and premises as aforesaid, the defendant, on or about the twenty-second day of December, 1885, wrongfully, and without right, license, or title, entered into and upon said lands and premises, and ousted and ejected plaintiff therefrom, and has ever since wrongfully withheld, and still so withholds, the possession thereof from the plaintiff, to its damage in the sum of $5,000. It then proceeds to say that the rents, issues, and profits of said premises from December 22d, 1885, and while plaintiff has been so excluded therefrom, are $10,000. It then prays for equitable relief, and for possession. An answer was filed, which was afterwards abandoned, and an amended or supplemental answer

filed instead, the only part of which necessary to be stated
at this point is that part which denies that the plaintiff is
or ever was the owner, or seized in fee or otherwise, or ever
was entitled to the possession, of the premises described
in plaintiff's complaint, or any part of said premises.   The
trial in the court below resulted in a judgment in favor of
the defendant, from which an appeal was taken by the
plaintiff, and the case is brought here upon a transcript
containing in full the findings and evidence upon which
the court below acted.   The findings of fact, so far as
necessary to be now stated, are:   "*First.*   The plaintiff
claimed title to the premises in question by two distinct
chains of title—one through a patent of the United States
issued to one Josette Clotier, and the other through the
location upon the said premises of the Cleveland mining
claim, the Cove Creek mining claim, and the Clear Creek
mining claim.   The Court finds the patent of Josette
Clotier was issued under the seal of the United States, and
purported to convey to the said Josette Clotier the
premises described in the complaint.   The patent was
dated the tenth day of October, 1870, and was in words
and figures hereto annexed, and marked 'Exhibit No. 1,'
and made a part of these findings.   *Second.*   That the
said location of lands thus patented was procured by one
Milton F. Clements, by virtue of a power of attorney from
one Josette Clotier, who held Chippewa mixed blood scrip
for the amount of land thus taken up, a copy of which
power of attorney is hereto annexed, and marked 'Exhibit
No. 2,' and made part of these findings.   *Third.*   That by
virtue of said power of attorney the said Milton F. Clem-
ents did, after the issuing of said patent, convey an un-
divided one-third thereof to Ferdinand Dickert, and after-
wards, and prior to August 7th, 1872, conveyed the right,
title and interest of the said Josette Clotier, by quit claim
deed, in the remaining two-thirds of said eighty acres, to
Ferdinand Dickert.   *Fourth.*   The said Ferdinand Dickert,
by deeds containing covenants of general warranty, did,
on the seventh day of August, 1872, convey to David M.
Marsh, Eugene Graselli, Daniel Myers, Henry E. Sherwin,
Edward P. Williams, Edward Harwood, Truman Dunham,

Alanson T. Osborne, and G. O. Griswold, the grantors of
the plaintiff, in fee simple, thirty-one fortieths, undivided,
of the premises described in the complaint. That on the
twenty-seventh day of November, 1873, the said Ferdi-
nand Dickert, and his grantees under the deed of the
seventh day of August, 1872, conveyed by a deed contain-
ing covenants of general warranty the whole of said
premises described in the complaint, in fee simple, to the
said plaintiff." Upon this branch of the case the Court
finds as conclusions of law as follows: "*First.* The Court
finds as a conclusion of law that the patent set forth in the
findings of fact to Josette Clotier was null and void, and
conveyed no title whatever to the lands' in controversy in
this action and described in the complaint; that notwith-
standing the issuing of said patent the said lands remained
unappropriated mineral lands of the United States."

The patent mentioned in the findings is as follows:
"The United States of America. Certificate No. 300, C.
To all to whom these presents shall come, greeting:
Whereas, by the seventh clause of the second article of
the treaty of the Chippewas of Lake Superior and the
Mississippi, dated the thirtieth day of September, 1854, it
is provided that each head of a family or single person
over twenty-one years of age at the present time, of the
mixed bloods belonging to the Chippewas of Lake Supe-
rior, shall be entitled to eighty acres of land, to be
selected by them under the direction of the President.
And, whereas, there has been deposited in the general
land-office of the United States a certificate of the register
of the land-office at Salt Lake City, No. 1, whereby it
appears that Chippewa certificate No. 300 C, in the name
of Josette Clotier, for eighty acres, issued by the Commis-
sioner of Indian Affairs under the aforesaid treaty, has
been located and surrendered by the said Josette Clotier
in full satisfaction of the lots numbered three and four of
section seven, in township twenty-six south, of range six
west, in the district of lands subject to sale at Salt
Lake City, Utah Territory, containing seventy-nine acres
and eighty-two hundredths of an acre, according to the
official plat of public lands returned to the land office

by the surveyor general which said tract has been located by the said Josette Clotier: Now, know ye, that the United States of America, in consideration of the premises, have given and granted, and by these presents do give and grant, unto the said Josette Clotier, and to her heirs, the said tract above described, to have and to hold the same, together with all the rights, privileges, immunities, and appurtenances of whatsoever nature thereunto belonging, to the said Josette Clotier, and to her heirs and assigns, forever. In testimony whereof, I, Ulysses S. Grant, President of the United States of America, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed. Given under my hand, at the City of Washington, the tenth day of October, in the year of our Lord one thousand eight hundred and seventy, and the independence of the United States the ninety-fifth. By the President, U. S. Grant. By J. Parrish, Secretary. I M. Godman, Recorder of the General Land Office. Recorded volume 2, p, 306."

From the current history of the country we learn that at an early day in the settlement of North America a body of French settled in and about Lake Superior and among a tribe of Indians then and afterwards known as the Chippewa Indians of Lake Superior. The result of this French settlement was to create a class or tribe of Indians known as "Mixed Bloods," who occupied the same territory with the full bloods of the Chippewa tribes. On the thirtieth day of September, 1854, at a place called La Pointe, in the State of Wisconsin, certain commissioners, appointed by authority of the United States, concluded with the Chippewa Indians of Lake Superior a treaty, the first article of which is to the effect that said Indians ceded to the United States all the lands heretofore owned by them in common with the Chippewas of the Mississippi lying east of the following boundary line, to-wit: "Beginning at a point where the east branch of Snake river crosses the southern boundary line of the Chippewa country; running thence upon said branch to its source; thence nearly north in a straight line to the mouth of East

Savannah river; thence up St. Louis river to the mouth of
East Swan river; thence up the East Swan river to its
source; thence in a straight line to the most westerly bend
of Vermilion river; and thence down the Vermilion river
to its mouth." To this treaty the Chippewas of the
Mississippi also consented and agreed. The second article
of the treaty contains seven clauses, all of which purport
to secure to the Indians certain rights in consideration for
the lands which they had ceded. The first clause sets
aside for the L'Anse & Vieux de Sert bands "all the
lands in the following townships in the State of Michi-
gan:" (then proceeds to give the boundaries of their lands
so set aside for them.) The second clause sets aside
certain lands for the La Pointe band; the third clause
sets aside certain lands for the Wisconsin bands; and the
fifth clause, certain land for the Grand Portage band; and
the sixth clause certain lands for the Ontonagon; and the
seventh clause is as follows: "Each head of a family,
or single person over twenty-one years of age at the
present time, of the mixed bloods, belonging to the Chippe-
was of Lake Superior, shall be entitled to eighty acres
of land, to be selected by them under the direction of the
President, and which shall be secured to them by patent in
the usual form." It will be observed at this point that the
lands described in the clauses above mentioned as being
set apart to the several bands of Indians there named are
all taken out of the ceded lands contained and described in
the first article of the treaty, while, so far as the second
clause is concerned, it does not describe the lands from
which the mixed bloods are to have their eighty acres
each, nor is there anything in the seventh clause of itself
which indicates in any manner where said lands are to be
taken from, or where they are to be located. The third
article of the treaty is as follows: "Art. 3. The United
States will define the boundaries of the reserved tracts
whenever it may be deemed necessary, by actual survey,
and the President may, from time to time, at his dis-
cretion, cause the whole to be surveyed, and may assign to
each head of a family or single person over twenty-one
years of age, eighty acres of land for his or their separate

use; and he may at his discretion, as fast as the occupants become capable, of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. He may also, at his discretion, make rules and regulations respecting the disposition of the lands in case of the death of the head of a family or single person occupying the same, or in case of its abandonment; and he may also assign other lands in change for mineral lands, if any such are found in the tract herein set apart; and he may also make such changes in the boundaries of such reserved tracts or otherwise as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases." It is quite evident, as will be shown more fully hereafter; that this third article of the treaty is dealing alone with the lands mentioned and described in the first six clauses of the second article.

We learn from the records on file in the land office that Josette Clotier, a woman of the mixed blood of the Chippewas, mentioned in the seventh clause of the second article of the treaty, heretofore quoted, had issued to her a scrip, or float, No. 300, C, and that by virtue of this the grant heretofore stated was issued, and this grant is made the foundation of the plaintiff's claim in this suit. The court below, as has been seen, found as matter of law that this grant was void. The case has been most ably and elaborately argued in this court, and, while the ground upon which the court below predicated its judgment is not made to appear in the record other than can be inferred from the findings above set out, we are advised by the respondent's brief, and the arguments made thereon, as to the exact ground upon which such adjudication was made. To copy from the brief of the respondent's attorneys the exact language, we find it asserted as follows: "It is objected to this patent that it is void on its face because issued without authority of law: *First*, because no act of congress authorized the issuance thereof, and because,

under the treaty-making power, the president and senate had no authority to dispose of these lands without the consent of congress; *second,* because the language of the treaty imports a contract simply contemplating future action to carry it into effect, and that congress alone can execute it; *third,* if it be conceded that the treaty-making power had the power to dispose of the land of the United States, and that the treaty was self executing, then the patent would still be void, because no patent could issue under the treaty except for lands ceded to the United States thereby." In support of this position the counsel further insist as follows: "The constitution of the United States provides that congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. It also provides that this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." From which counsel deduce this corollary: "It is a well-settled rule of statutory construction that general and specific provisions in apparent contradiction, whether in the same or different statutes, and without regard to priority of enactment, may subsist together, the specific qualifying and supplying exceptions to the general."

It cannot be denied that counsel for respondent have propuced respectable authorities which hold the position that they contend for. The case of *Parker* v. *Duff,* 47 Cal. 554, is a case where a patent was issued under precisely similar circumstances as the one in this case; and after a very thorough examination of the authorities, and, we may say, in a most labored and learned opinion, the court concludes as follows: "The registers and receivers of the United States land offices, in permitting entries of public lands to be made, must look only to acts of congress and to such regulations of the general land office as have been made in pursuance of law. They have no powers except such as are derived from these sources. *Second.* The head of the land department of the United States has

no authority to direct or permit entries of land to be made
in the local offices unless in cases authorized by some act
of congress.    *Third.*    The treaty-making power can not
confer upon the land department any authority, nor enjoin
upon it any duty, in respect to the sale, conveyance, or dis-
posal of the public lands of the United States, except with
the consent of congress." And it therefore concludes that,
"if a treaty is made with a tribe of Indians by which they
relinquish to the United States their lands, with certain
reservations, and the treaty provides that the heads of
families in the tribe shall each be entitled to eighty acres
of land, to be selected under the direction of the president,
and to be secured by patents, the officers of the land de-
partment cannot issue scrip for land selected under the
treaty outside of the ceded territory, nor can the president
issue patents therefor in the absence of legislation by con-
gress authorizing it to be done." A further conclusion is
that "the treaty with the Chippewas of Lake Superior,
giving to each head of a family of mixed bloods of the
tribe eighty acres of land to be selected by the president
and patented, does not permit the selection of lands for
such mixed bloods on the public domain outside of the ter-
ritory ceded to the United States by the Indians in the
treaty." And further, that "scrip issued for such lands,
selected outside of said territory, is issued without author-
ity of law, and patents issued therefor, which show for
what they were issued, are void on their face." In the case
of *Pugsley* v. *Brown*, 35 Fed. Rep. 688, an opinion de-
livered by Judge Hallett, in the circuit court of the United
States, in Colorado, without arguing the question, comes
to the same conclusion, citing the California case above
mentioned.

These positions of the counsel for the respondent, to-
gether with the authorities which they cite, have been
pressed upon this court with much earnestness, and it now
devolves upon us to examine the question for ourselves,
and to see if those cases cited are of themselves such as
this court ought to follow. In the case of *Holden* v. *Joy*, 17
Wall, 211, this subject came before the supreme court of
the United States for discussion; and, while the point was

not actually decided in that case, because not necessary to the judgment, it may be instructive to quote here what the Court does say. At page 246 the following language is used: "Objection is made by the appellant that the treaty was inoperative to convey the neutral lands to the Cherokee Nation (which may well be admitted), as none of its provisions purport, *proprio vigore*, to make any such conveyance. Nothing of the kind is pretended; but the stipulation of the second article of the treaty is that the United States covenant and agree to convey to the said Indians and their descendants, by a patent, in fee simple, the described additional tract, meaning the tract known as the "neutral lands;" and the third article of the treaty stipulates that the lands ceded by the treaty, as well as those ceded by a prior treaty, shall all be included in one patent, to be executed to the Cherokee Nation of Indians by the President, according to the provisions of the before-mentioned act of congress. Suppose that is so, still it is insisted that the President and the senate, in concluding such a treaty, could not lawfully covenant that a patent should issue to convey lands which belonged to the United States without the consent of congress; which cannot be admitted. On the contrary, there are many authorities where it is held that a treaty may convey to a grantee a good title to such lands without an act of congress conferring it, and that congress has no constitutional power to settle or interfere with rights under treaties, except in cases purely political. Much reason exists, in view of those authorities, and others which might be referred to, for holding that the objection of the appellant is not well founded; but it is not necessary to decide the question in this case, as the treaty in question has been fully carried into effect, and its provisions have been repeatedly recognized by congress as valid." The case of *U. S.* v. *Brooks* 10 How., 445, is strongly in corroboration of the idea that the President and the senate do possess the power in the contracting of treaties which is denied by the respondent in this case. The treaty concluded by the United States with the Wyandotte tribe of Indians, and proclaimed March 1, 1855, provides in the tenth article, among other

things, "that each of the individuals to whom reservations were granted by the fourteenth article of the treaty of March 17th, 1842, or their heirs or legal representatives, shall be permitted to select and locate said reservations on any government lands west of the states of Missouri and Iowa, subject to preemption and settlement; said reservations to be patented by the United States in the name of the reservees as soon as practicable after the selections are made, and the reservees, their heirs or proper representatives, shall have the unrestricted right to sell and convey the same whenever they may think proper." It will be seen by an examination of this treaty that it expressly provides for the patenting of lands to members of the Wyandotte tribe, located entirely outside of the cession made by the Indians in such treaty. And in the case of *Walker* v. *Henshaw*, 16 Wall, 436, this clause of the treaty came before the supreme court of the United States, and no suggestion was there made that it was invalid, but, on the contrary, it was treated as a valid and binding law by that court.

In a treaty concluded with the Cherokee tribe of Indians on the twenty-ninth of December, 1835, at New Echota, in the State of Georgia, as a part of the second article it was provided: "And whereas, it is apprehended by the Cherokees that in the above session there is not contained a sufficient quantity of land for the accommodation of the whole nation on their removal west of the Mississppi, the United States, in consideration of the sum of five hundred thousand dollars therefor, hereby covenant and agree to convey to the said Indians and their descendants, by patent, in fee simple, the following additional tract of land, situated between the west line of the State of Missouri and the Osage reservation," etc. It will be seen by examining this treaty that the Government of the United States was seeking to remove these Indians from out the States of North Carolina, Georgia, Tennessee, and Alabama, where they had become a disturbing element to the population of those States, and to carry them west of the Mississippi river; and that this treaty expressly stipulates that for this additional

800,000 acres of land, lying west of the Mississippi, a patent in fee-simple is to be given to said Indians, to them, their heirs and assigns, forever.

Any number of treaties of like character between the United States and the Indians can be found; and whether, in the first instance, such treaties were negotiated in pursuance of an Act of Congress first passed for that purpose, or whether they were ratified by Congress subsequent to their negotiation, in each and every case we find the treaty-making power of the United States assuming to contract for the disposition of the public lands of the United States to the Indians, and that patents shall be issued to them therefor, and in almost every instance, whether such treaties were negotiated in pursuance of an Act of Congress or whether they were subsequently ratified by an Act of Congress, the Congress did, by making appropriations of money and otherwise, constantly and up to now do continue to recognize the validity of such treaties, by making appropriations to carry out the stipulations therein contained; and it would seem singular indeed that, if this power does not exist, as contended for by counsel for the respondent, and is held by the authorities cited by them, the matter should have for so many years (in fact, almost during the whole existence of the Government) gone entirely unchallenged by the Congress of the United States.

But it is said by the respondent that wherever the treaty-making power has undertaken to dispose of the public lands of the United States to the Indians by patent, it has only assumed to direct and contract for the issue of patents for lands contained in the ceded territory. In other words, counsel for respondent seems to take a distinction between the right of the treaty-making power to contract for the issue of patents for lands ceded by the Indians in these treaties, and for lands not lying within the ceded territory; contending, as they do, that in consideration of the fact that the Indians are making a concession to the Government of lands, the Government might in that case, by its treaty-making power, provide for the issuance of patents to them out of the reserved

lands, but that, so far as the public domain is concerned, it can only be disposed of by Congress. If this position were conceded, it would probably serve the purpose of the counsel for the respondent in this case, notwithstanding the fact that treaties have been made by the President and the Senate which did assume to do just that which the counsel here deny the power to do. But is the position a sound one? We think not. A proper understanding of this question necessarily involves an examination into the relative rights of the United States as the successor of Great Britain and other powers from whom she holds her territory, and the Indians who occupied North America anterior to its discovery and caption by the European powers. In the case of *Holden* v. *Joy,* 17 Wall. 243, it is said: "Beyond doubt the Cherokees were the owners and occupants of the territory where they resided before the first approach of civilized man to the western continent, deriving their title, as they claim, from the Great Spirit, to whom the whole earth belongs; and they were unquestionably the sole and exclusive masters of the territory, and claimed the right to govern themselves by their own laws, usages and customs. Guided by nautical skill, enterprising navigators were conducted to the new world. 'They found it,' says Marshall, C. J., 'in possession of a people who had made small progress in agriculture or manufactures, and whose general employment was war, hunting and fishing. Expeditions were fitted out by all the great maritime powers of the old world, and they visited many parts of the newly discovered continent, and each made claim to such part of the country as they visited. Disputes arose, and conflicts were in prospect, which made it necessary to establish some principle which all would acknowledge, and which would decide their respective rights in case of conflicting pretensions. Influenced by these considerations, they agreed that discovery should determine the right; that discovery should give title to the government by whose subjects, or by whose authority, it was made, against all other governments, and that the title so acquired might be consummated by possession.' As a necessary consequence the principle estab-

lished gave to the nation making the discovery the sole right of acquiring the soil, and of making settlements on it. Obviously this principle regulated the right conceded by discovery among the discoverers, but it could not affect the rights of those already in possession, either as aboriginal occupants or as occupants by virtue of a more ancient discovery. It gave the exclusive right to purchase, but it did not found that right on a denial of the right of the possesser to sell. Colonies were planted by Great Britain, and the United States, by virtue of the revolution and the treaty of peace, succeeded, to the extent therein provided, to all the claims of that government, both political and territorial. Throughout, the Indians as tribes or nations have been considered as distinct, independent communities, retaining their original, natural rights as the undisputed possessors of the soil from time immemorial, subject to the conditions imposed by the discoverers of the continent, which excluded them from intercourse with any other government than that of the first discoverer of the particular section claimed. They could sell to the government of the discoverer, but they could not sell to any other governments or their subjects, as the government of the discoverer acquired, by virtue of their discovery the exclusive pre-emption right to purchase, and the right to exclude the subjects of all other governments, and even their own, from acquiring title to the lands." This brief history, so recited, at once demonstrates that, so far as the actual title to the land was concerned, there was and could be no difference between that occupied by the Indians and that not so occupied; that the government of the United States succeeded to the title to all the lands, which title was absolutely vested in the government in fee simple, subject at all times (which concession was in the interest of humanity and Christianity) to the prior right of occupancy of the aboriginal tribes of North America; and in the case of *Johnson's Lessee* v. *M'Intosh*, 8 Wheat. 592, this language is used by Chief Justice Marshall in speaking of the case of *Fletcher* v. *Peck*, 6 Cranch, 87: "This opinion conforms precisely to the principle which has been supposed to be recognized by all European governments, from

the first settlement of America.    The absolute, ultimate
title has been considered as acquired by discovery, subject
only to the Indian title of occupancy, which title the dis-
coverers possessed the exclusive right of acquiring.    Such
a right is no more incompatible with a seisin in fee than a
lease for years, and might as effectually bar an ejectment."
It will thus be seen from the language quoted from Chief
Justice Marshall that, so far as the title is concerned, it
was vested absolutely in the United States; and the court
holds in so many words that a title to lands derived solely
from a grant made by an Indian tribe northwest of the
Ohio, in 1773, and 1775, to private individuals, cannot be
recognized in the courts of the United States.

These authorities are cited as showing that, so far as
the right of the government of the United States, either
under the exercise of the treaty-making power or under
the exercise of the constitutional grant to congress to dis-
pose of the public domain, exists, it is one and the same
thing.    If it is to be rested upon any question of title, it
will easily be seen that, subject to the prior right of occu-
pancy by the Indians, there is and can be no difference in
the power of the United States in the one mode or the
other of disposing of that title by patent.    The case of
*Wilson* v. *Wall*, 6 Wall. 83, may also be read with interest
in connection with the authorities above cited as illustrat-
ing the same point.    In the light of these authorities and
suggestions, we are of the opinion that the case of *Parker*
v. *Duff*, in 47 Cal. 554, and of *Pugsley* v. *Brown*, in 35
Fed. Rep. 688, are not correctly decided, and must decline
to follow them.    On the contrary, we hold that it is within
the purview of the treaty-making power of the United
States to confer upon the land department both authority
and the duty to execute conveyances, and make disposal of
the public lands of the United States without the consent
of congress, either first had or by ratification, and that if
the case is to rest here, the grant which is made the foun-
dation of the plaintiff's title is a valid and subsisting grant.

It may be well enough now to recur to the language of
the seventh clause of the treaty itself, when it will be seen
that while the lands set apart to all the Indians of the

Chippewa tribe except the mixed bloods are carefully bounded and taken out of the ceded lands, yet, when it comes to the seventh clause, which concerns the mixed bloods, there is not only no reference to any ceded lands, but the language expressed is that "the lands to be selected by them under the direction of the president, and which shall be secured to them by patent in the usual form;" evidently contemplating that, so far as these mixed bloods are concerned, they, being superior in intelligence and thrift to the full bloods of their tribe, were able to shift for themselves; and it was not contemplated that they should be confined in their residence to the ceded lands. Much argument has been made upon the action of the interior department at Washington with reference to this very subject now under discussion.   It seems that different opinions at different times have existed among the persons occupying the position of secretary of the interior and of the land office concerning the power of the government to issue scrip and grants under the seventh clause of the treaty to the mixed bloods, and according as opinions may have varied we find in the departments at Washington having control of this matter a difference of action at different times with reference to it.   So much confusion, indeed, had arisen that in 1871 Congress took charge of the matter, and passed the following resolution:   "Resolved, that the secretary of the interior be requested to communicate to this house the following information in relation to the issuance of scrip to the half-breeds or mixed bloods belonging to the Chippewas of Lake Superior under the seventh clause of the second article of the treaty of September 30, 1854, with the Chippewa Indians of Lake Superior and the Mississippi valley, viz.: *First,* the number of pieces of scrip of 80 acres each, and the names of the parties to whom issued; *second,* the number and names of applicants to whom no scrip has been issued, whose applications are now on file; *third,* the population of the Chippewas of Lake Superior, and where located at the date of said treaty; *fourth,* a copy of said scrip, the manner of locating the same, whether by the parties to whom it was issued or by others, whether located upon lands

ceded by said tribe, and all decisions of the department of the interior in relation to the issuance and location of said scrip; *fifth,* a copy of all reports to the Indian office or department of the interior of persons authorized to investigate any matters relating to the applications for scrip of said half-breeds or mixed bloods, where said half-breeds or mixed boods reside at the date of their said application, and whether parties other than those entitled to the benefits of said treaty have received said scrip; and, *sixth,* the number of acres of land for which said scrip has been issued." This resolution having been transmitted to the department of the interior, a full investigation of the matter was had, and a report made to Congress, in which we find, on pages 244 to 259, inclusive, the different scrip that had been issued, and upon which grants or patents had been issued by the department at Washington. These amount to about 350. The different parcels of land granted were located in Minnesota, Wisconsin, California, Colorado, Utah, and probably other places, and among them, at page 257, we find the identical grant now in question, which was issued to Josette Clotier, on scrip 300, C, lots Nos. 3 and 4, section 7, township 26 S., of range 6 W., Salt Lake City, dated October 10, 1870. With these grants, conveying large amounts of lands set forth specifically in this report made to Congress in answer to the resolution above quoted, on the eighth of June, 1872, it passed an act requiring the secretary of the interior to "permit the purchase, with cash or military bounty land-warrants, of such lands as may have been located with claims arising under the seventh clause of the second article of the treaty of September 30, 1854, at such price per acre as he deems equitable and proper, but not at a less price than $1.25 per acre; and the owners and holders of such claims in good faith are also permitted to complete their entries and to perfect their titles under such claims, upon compliance with the terms above mentioned; but it must be shown to the satisfaction of the secretary of the interior that such claims are held by innocent parties in good faith, and that the locations made under such claims have been made in good faith, and by innocent holders of the same." Now, when we come

to reflect that this act of Congress has reference alone to the scrip that has been issued to the half-breeds under the seventh clause of the treaty by the land department, and when we come further to reflect that Congress had before it the fact that over 350 grants had been theretofore issued upon like scrip for lands situated both inside and outside of the ceded territory, it is impossible to escape the conclusion that Congress meant to ratify and affirm the grants already issued, if any such ratification and confirmation were needed to make them valid. It is a rule of law well-known that a refusal of the legislative power to disaffirm or annul the acts of the officers of the government, when brought before them, is a legislative confirmation of such acts. Viewed in the light of these suggestions, it is impossible to conclude otherwise than that if Congress had not regarded these grants that had already been issued upon this mixed blood Chippewa scrip as valid, it would have taken occasion, with the subject before it, when it was legislating concerning it, to have disaffirmed and annulled such grants. Not having done so, we repeat that the conclusion is inevitable that this amounts to and was intended by Congress to be a legislative affirmation of their validity, if any such were indeed needed.

There is another branch of this case to which it is necessary that attention should be paid. The fifth finding of fact is to the effect that, except for the patent aforesaid, the premises demanded by the plaintiff were, on the second day of August, 1876, vacant, unappropriated mineral lands of the United States, containing valuable sulphur deposits and sulphur-bearing rock. The seventh finding then proceeds to say that "on the day aforesaid (meaning that mentioned in the last finding) Ferdinand Dickert, being then a citizen of the United States, located the Cleveland mining claim in his own name, but for the use and benefit of the plaintiff, and that the location was distinctly marked on the ground, so that its boundaries could be readily traced, and it embraced valuable sulphur deposits within the premises described in the complaint, except that a small fraction of said claim lies outside of said premises." The finding then proceeds to lay out by

metes and bounds the several claims and locations so
as aforesaid made by Ferdinand Dickert. In the eleventh
finding it is stated that "during the years 1876, 1877,
1878, 1879, 1880, and 1881, Ferdinand Dickert did the
one hundred dollars' worth of assessment work on said
claim as stockholder and agent for the plaintiff, and
for and on its behalf; that he demanded and received
payment from the plaintiff for such assessment work for
the years above mentioned; that early in the year 1882
said Dickert resigned his position as agent for the plain-
tiff in charge of said property, and refused to act further
for the plaintiff, or on its behalf, or for its benefit, and
assumed and took adverse possession of said Cleveland
mining claim and sulphur mine, and continuously there-
after until the eighteenth day of December, 1885, held
possession thereof adversely to the plaintiff." The twelfth
finding is to the effect that "in the years 1882, 1883, and
1884 said Ferdinand Dickert did the assessment work upon
the said Cleveland mining claim for and in his own behalf,
or on behalf of himself and Myers, claiming adversely to
said plaintiff, and at his, or his and Myers' own expense;
that the said plaintiff has never paid for any of said assess-
ment work, nor offered to pay for any of the assessment
work done during the last mentioned years or since that
time; that on the eighteenth day of December, 1885,
the said Ferdinand Dickert made a quit-claim deed of
said mining claim to the defendant company, and there-
upon said defendant, under said deed, entered into posses-
sion thereof, and from that time until the commencement
of this action continuously held possession thereof ad-
versely to plaintiff, and does now so hold said possession."
The fifteenth finding is to the effect that "the said plain-
tiff did, in the year 1882, entirely abandon the said Cleve-
land mining claim, and any right, claim, or title thereto or
any part thereof, and disclaimed any title gained by virtue
of said location." The sixteenth finding is to the effect
"that the said plaintiff, by omitting and neglecting to
do any work or cause any work to be done in its be-
half, or to pay for any work between the years 1880
and 1888, entirely abandoned any and all claim to said

sulphur mining location; that the work was not done for or on behalf of plaintiff during any of said years, and no attempt or application to do work in its behalf was' made in said years." The twentieth finding is to the effect that " on the twentieth day of August, 1888, the said premises described in the complaint were vacant, unappropriated public lands of the United States; that on that day Lorenzo Dickert located for the defendant three mining claims thereon, having discovered, at the point of discovery of each of said mining claims, mineral in place." As conclusions of law the findings are as follows: "(2) That whatever title was acquired by Ferdinand Dickert by the location of the Cleveland mining claim at once inured to the benefit of said plaintiff, and became its property, in consequence of the warranties contained in deeds of conveyance by himself and his grantees to the plaintiff. (3) That the plaintiff lost all right, title, and claim to the Cleveland mining claim, and the premises included therein, by abandoning the same in 1882, and by failing to do the annual assessment work thereon, as required by the Act of Congress, from the year 1881 to June 9, 1888; the time this suit was commenced."

In order to a proper understanding of these findings, it is necessary to recite a few of the facts contained in the record. The lands described in the patent to Josette Clotier were conveyed by her attorney in fact, Milton F. Clements, to Ferdinand Dickert, and by Dickert, in undivided interests, to David M. Marsh and others by separate deeds; and in 1873 this plaintiff company was incorporated under the laws of Ohio, the incorporators being David M. Marsh, Truman Dunham, Eugene Graselli, Henry E. Williams, Daniel Myers, and Alanson T. Osborne. To this company, so organized, Dickert and his associates conveyed the entire premises described in the patent to Josette Clotier, on the seventeenth day of November, 1873. It will thus be seen that the plaintiff in this case, by sundry mesne conveyances, became the owner of the demanded premises, as described in the patent; and in 1876, some doubt having risen in the minds

of those in management of the affairs of the company
as to whether the patent would cover and convey mineral
lands, it was agreed and understood that Ferdinand Dick-
ert, for and on behalf of the plaintiff company, should
go upon the lands and locate the several mining claims, as
set out in the seventh finding of fact heretofore recited. It
will further be observed that Dickert was not only one of
the original incorporators, but that he was a director
in the plaintiff company, and likewise its agent. The
record discloses the fact that Dickert was a resident of
the Territory of Utah, and as such had charge of the
affairs of the company in the Territory, while the head-
quarters of the home company was at Cleveland, Ohio.
The record further discloses the fact that at divers times
the home company was a little slow in forwarding to
Dickert the money with which to pay the assessment
work that was necessary to be done each and every year in
order to keep the claims which he had located for the
company alive, as required by the Act of Congress. It
seems that there was much correspondence between the
parties, and at several times Dickert himself visited Cleve-
land, Ohio, and had personal interviews with the different
members of the board of directors, as well as at times with
the board of directors in regular session. At other times
we find him writing to them upon the subject. At page
97 of the transcript is found a letter directed to Truman
Dunham, Esq., Cleveland, Ohio, dated January 21, 1882.
That letter discloses the fact that there was some com-
plaint by Dickert against the company for failing to furn-
ish the money, as before stated, to pay for the assessment
work that had been done, and that was necessary to be
done in the future. At page 99 we find the following in
the letter: "Morally and legally I am only responsible
for my report on the value of the property, but I didn't
want any misunderstanding about this, and will pay the
company the money back I received, and interest for the
time, and I take the property. The situation is very im-
portant, and I wish that it is considered that way. I have
been many times at my expense to Cleveland in the inter-
est of the sulphur claims. It is not more than fair, and

the only way to settle it between us, that somebody of the company comes this time to Salt Lake, with power of attorney from the other gentlemen interested, but it must be inside of thirty days from date. After that time I consider the company dissolved. In that event the company will own their interest in the Mariposa and Prince Albert and in the Cleveland sulphur mining claim." It will thus be seen that at the date of this letter—the twenty-first day of January, 1882—Dickert was acknowledging the right of the company to this property; but it seems that another idea possessed him, and that, because the company did not meet as promptly as he thought proper his demands for money, he concluded to at once strip himself of the character of director and agent for the company, and, so far as in his power lay, to "dissolve the company," to use his own language, and in pursuance of this purpose he at once, as the findings heretofore recited show, entered upon and took adverse possession of the property of the company, and held the same until 1885, when he conveyed to the defendant company by quitclaim deed; and, as the findings show, the defendant company held adverse possession up to the time of the trial of this case in the court below. It is now insisted by the defendant that the facts in the record do not show that Dickert had such adverse possession of the property as prevented the plaintiff from entering thereupon and doing the assessment work required by law, and that therefore the finding of the court that the plaintiff company abandoned its claim in the early part of 1882 and thereafter is correct.

In the first place, we consider a complete answer to this position to be that the court has found as matter of fact that "early in the year 1882 said Dickert resigned his position as agent of the plaintiff in charge of said property, and refused to act further for the plaintiff, or on its behalf, or for its benefit, and assumed and took adverse possession of said Cleveland mining claim and sulphur mine, and continuously thereafter, until the eighteenth day of December, 1885, held possession thereof adversely to the plaintiff." By this finding the defendant is bound. It is a finding of the court upon facts of the case. It comes to us entirely

unexcepted to or unchallenged in any way, and it is not now open for re-examination by this court. If it were necessary, however, to re-examine the facts, it would be found that there was no proof in the record at all to support that part of the finding which asserts that "early in the year 1882 Dickert resigned his position as agent of the plaintiff in charge of said property." There is no evidence in the record, so far as we can discover, whatever, to show that this company understood, or that Dickert had notified the company in any way, that he had stripped himself of the character of director and agent, and had taken adverse possession of the property contrary to his duties in the premises. In the first place, it is exceedingly doubtful, all other questions aside, as matter of law, whether it were in the power of Dickert, occupying the fiduciary relation to this company that he did, to assume the adverse relations that he undertook to do, in the manner in which the finding says he did. So far as any dues from this company to him were concerned, that was a matter that he could easily settle by a suit in equity, or even by suit at law. If he had expended money for or on behalf of the company which it refused to refund, he could have compelled payment by lawful conduct.

Further, upon the subject of adverse possession, the twelfth finding is to the effect that on the eighteenth day of December, 1885, Dickert conveyed to the defendant the very premises in dispute by quitclaim deed. It is utterly impossible to understand how those two findings, the eleventh and twelfth, can be true, and the fifteenth and sixteenth be true. If Dickert, (and later on his grantee, the defendant,) in the early part of 1882, assumed and took adverse possession of the property, and held it up to the time of bringing this suit, then certainly there was no chance or opportunity for the plaintiff to do the assessment work necessary to keep the claim alive. We feel quite sure that there could be no abandonment of the premises by the plaintiff, in view of the fact that they were in the exclusive and adverse possession of another. Under the law the plaintiff had the entire year of 1882 in which to do the assessment work, and yet the fact remains

that in the early part of the year – exactly how early the finding does not say— this adverse possession was assumed by Dickert, and the plaintiff entirely ousted of its premises; and from that time on there is no finding nor fact stated in the record, in any shape, which goes to show that the plaintiff was ever at any time let into the possession of its property, so it could do the assessment work; but, on the contrary, the unchallenged findings of. the court are to the effect that adverse possession was held by others to the entire ousting of the plaintiff. In this view of the case, the fifteenth, sixteenth, and twentieth findings are not supported by the facts; and, being excepted to by the plaintiff, we hold that such findings by the court below were erroneous, and in that view of the case the third finding of law is error.

Further, it will be observed that the second finding of law is to the effect that whatever title Ferdinand Dickert may have acquired in any way would pass by virtue of his warranty deed to the plaintiff company; and in this view, when he undertook to convey by quitclaim deed to the defendant company, he had nothing to convey. The conduct of Dickert and his associates in this matter subsequent to the assumption of adverse possession of the plaintiff's property in the early part of 1882 is anything else but such as to recommend itself to a court of justice. Dickert, in his testimony, is vague, indefinite, and unsatisfactory, and frequently declines to explain matters satisfactorily, when the information called for was necessarily with him, and with no one else. The truth is, he seems to have come to the conclusion that the property was very valuable, and that the "find," so to speak, was a good one; and, the home company being a long way off, he at once set about, notwithstanding the fact that he occupied the fiduciary relation of both director in the company and agent of the company, to defeat it of its title, and deprive it of its property. We repeat that his conduct, as exemplified by this record, is not such as to give this court any great amount of confidence in his right action. We have no patience with such shuffling as we find him guilty of in this case. If the plaintiff company owed him any money,

as before stated, he had a remedy for its recovery. He was upon the ground, the courts were open to him, and, instead of resorting to such modes, he turns to be an enemy to the company, and enters into combinations with others to defeat it of its property. Upon the subject of adverse possession, the case of *Oreamuno* v. *Mining Co.*, 1 Nev. 179; the case of *Robinson* v. *Mining Co.*, 5 Nev. 44; and the case of *Mining Co.* v. *Vacavich*, 7 Sawy. 222, 7 Fed. Rep. 331,—may be read with interest. Those cases demonstrate the proposition that where adverse possession of a mining claim is taken and held wrongfully, that the rightful owner or locator is excused from doing the assessment work during the time of such adverse holding. The judgment of the court below is reversed, and the cause is remanded for a new trial.

SANDFORD, C. J., and HENDERSON, J., concurred.