## EOFF, *Appellant,* v. IRVINE *et al.*

### DIVISION ONE.

1. **Attorney and Client:** PURCHASE OF OUTSTANDING TITLE BY ATTORNEY. An attorney who has been consulted about a title to land will not be permitted to purchase an outstanding one, and then set it up in opposition to his client.

2. ——: ——. Where he purchases such outstanding title, he will be deemed to hold it in trust for his client, if the latter desires to claim the benefit of the purchase.

3. ——: ——. Nor does the withdrawal of the attorney from his client's employment leave the former at liberty to purchase the title about which he had been consulted and given his client advice.

4. ——. The relation of client and attorney is founded upon trust and confidence, and information acquired concerning the subject of the employment while the relation exists cannot thereafter be used by the attorney against the client.

5. **Quitclaim Deed:** PRIOR UNRECORDED DEED. A purchaser by quitclaim deed for value and without notice acquires under our recording act title, as against a prior unrecorded deed or other instrument conveying or affecting real estate.

6. ——: EQUITIES. One, however, who takes title by quitclaim deed, which title is subject to equities in the hands of the grantor takes subject to such equities.

7. ——: ——. Such quitclaim purchaser will, however, be entitled to reimbursement to the extent of the purchase money and interest as against the owner of the equity asserting the same.

*Appeal from Jackson Circuit Court.*—HON. R. H. FIELD, Judge.

REVERSED AND REMANDED.

*Hayward & Griffin* for appellant.

(1) As far as Leigh H. Irvine is concerned, had he made no transfer to his brother, the law is clear that he would hold the property in trust for the plaintiff.

*Davis v. Kline*, 96 Mo. 401–406, and cases cited. (2) And his brother, taking under a quitclaim deed, stands in no better position, for he takes the property subject to all equities. *Campbell v. Gas Co.*, 84 Mo. 352, and cases cited; *Fox v. Hall*, 74 Mo. 315. (3) Even though Louis C. Irvine had taken under a conveyance which, in law, would have authorized him to claim to be a purchaser for value, without notice, the facts in evidence show that he was not such a purchaser. (4) The conveyance to Mrs. Annie K. Irvine, being without consideration, cuts no figure in the case. (5) No laches are shown by pleadings or evidence, for no court has ever held eleven months to be laches; and eleven months is all the time that elapsed between date of outstanding title to Leigh H. Irvine, October 4, 1887, and filing of plaintiff's bill, September 21, 1888. If laches are relied on, the question is to be raised either by demurrer or answer (*Bliss v. Prichard*, 67 Mo. 181), which was not done. Moreover, Louis C. Irvine took quitclaim deed from his brother as soon as outstanding title appeared in his brother (that is, within two weeks); consequently, the eleven months that passed from that date, to filing of bill, did him no harm, as he did nothing to change his position. (6) In a case of this kind the better rule is that Leigh H. Irvine, or anyone in his stead, has no title to be reimbursed the money advanced (*Moore v. Bracken*, 27 Ill. 23; *Townsend v. Hadley*, 18 N. E. Rep. (Ind.) 457), and, clearly, not to pay for legal services. (7) If from the evidence, it appeared to the court that plaintiff was not entitled to the specific relief prayed for, the prayer for general relief authorized such relief as was just and equitable in the premises. Estee's Pleadings [3 Ed.] sec. 332; *Amos v. Scudder*, 11 Mo. App. 168. (8) If Louis C. Irvine is held to have acted in good faith, then this is a case in which one of two innocent persons must suffer, and it is to be determined not upon considerations of hardship, but on principles long known and well

recognized by courts of equity, which leave Louis C. Irvine in another action to recover against his brother for the fraud practiced ; if he did not act in good faith, he is entitled to nothing, either in this or any other case.

*H. E. Colvin* for respondents.

(1) Assuming that the relationship of attorney and client did exist between Leigh H. Irvine and C. W. Eoff, in May, 1887, the relation closed.long before either of the quitclaim deeds was procured. While it is a well-known principle of law that, during the confidential relationship of attorney and client, the attorney cannot secure gifts or make purchases from the client, or in any way abuse the confidence thus imposed upon him, it is also true that the disability of an attorney continues only so long as the relation of attorney and client continues, and as much longer as the influence of the relation can be supposed to extend. 1 Perry on Trusts [3 Ed.] sec. 202 ; Bispham's Equity [3 Ed.] sec. 236. (2) The court's attention is called to the fact that the interest of B. D. Kribben to the property in question, supposed to be an undivided one-half interest, was conveyed directly to Louis C. Irvine. Louis C. Irvine was innocent of any fraud or collusion which appellant imputes to Leigh H. Irvine. Hence, upon appellant's own pleading and evidence, he would, at the most, be entitled only to a decree affecting an undivided one-half interest in the property (formerly owned by Aaron O. Askew) upon a proper accounting.

BLACK, J.—The object of this suit in equity is to have the defendants declared the holders of the title to a lot in Kansas City in trust for the plaintiff, with a further prayer for general relief. The court found for the defendants, and the plaintiff Eoff appealed. The defendants, Leigh H. Irvine and Louis C. Irvine, are

brothers, and the sons of the other defendants, Clark Irvine and Annie K. Irvine. All of the above-named parties resided at Kansas City at the time of the various transactions hereafter mentioned.

The pleadings and the undisputed evidence show that the plaintiff purchased the lot in 1886, his grantor having only a tax title. Some doubt arose as to the validity of his title, and his abstract of the title was placed in the hands of Leigh H. Irvine and Mr. Blair for examination. They were attorneys at law and partners doing business under the firm-name of Blair & Irvine. They received the abstract about the first of May, 1887. On June 1, 1887, Hefferman, who was a former half owner of the lot, conveyed his undivided one-half to one Kribben, who resided in the city of St. Louis. Kribben conveyed the same interest to Louis C. Irvine by a quitclaim deed, dated the fourteenth of September, 1887, for $100 paid by either Leigh H. Irvine or by Blair & Irvine. On the eighth of October, 1887, Leigh H. Irvine procured a quitclaim deed from Askew for the other undivided one-half for the consideration of $100; and, on the eighteenth of the same month, conveyed his interest by quitclaim deed to his brother, Louis C. Irvine; and, in August of that year, the latter conveyed the lot to his mother by a warranty deed.

The first disputed issue of fact is, whether the relation of attorney and client existed between Leigh H. Irvine and the plaintiff. It appears the plaintiff and a Mr. Stevens were neighbors, and in former years Stevens had been a practicing attorney; plaintiff gave Stevens the abstract of title and requested him to examine it, but Stevens being out of the practice advised plaintiff to employ Blair & Irvine. The plaintiff did not know these attorneys, and he requested Stevens to take it to them for examination. The evidence of Stevens is that he left the abstract at the office of the attorneys on a table, but he does not know whether either of them was present. This was probably

about the first of May, 1887. In a short time plaintiff received a note from Irvine asking whether he would pay $1,000 for a quitclaim deed, with the request to call. He says he called at the office of these attorneys, and Irvine then pointed out the defects in the title and advised him to procure a deed from the owners. Irvine said he thought he could get the deed. There was a like conversation on the streets. He says the price asked for a quitclaim deed was more than he had paid for the property ; that after thinking over the matter he concluded Irvine was not acting in his interest, and that he directed Stevens to get the abstract,, and that Stevens got it and delivered it to him. This was ten days or two weeks after the abstract had been left at the office of the attorneys. They did not inform the plaintiff from whom they expected to get the proposed deed. The plaintiff paid the attorneys nothing for their services, and they made no demand of him for compensation.

The evidence of Mr. Stevens, in its general tenor, leaves it in doubt as to whether he employed Blair & Irvine to examine the abstract ; but he produces this doubt by the erroneous assumption on his part that it required a payment of money by plaintiff to the attorneys to create the relation of attorney and client. He was on friendly terms with Blair & Irvine, and his remembrance is defective as to what he did in the execution of his agency. The proof is clear that plaintiff directed Stevens to employ these attorneys, that Stevens left the abstract at their office, and that Irvine thereafter sent the plaintiff the note before mentioned, and advised the plaintiff to get a quitclaim deed from the owner. Irvine proposed to get it for him. This evidence as a whole shows beyond doubt that Stevens did employ these attorneys, and that they examined the abstract pursuant to that employment. The relation of attorney and client did, therefore, exist between Blair and Leigh H. Irvine on the one hand and the plaintiff on the other.

An attorney who has been consulted about a title to land will not be permitted to purchase an outstanding one, and then set it up in opposition to his client. If he does purchase such an outstanding title, he holds it in trust for his client, if the client sees fit to claim the benefit of the purchase. *Davis v. Kline*, 96 Mo. 406. Says the supreme court of the United States, it may be laid down as a general proposition that an attorney can in no case, without his client's consent, buy and hold otherwise than in trust an adverse title or interest touching the thing to which his employment relates. *Baker v. Humphrey*, 101 U. S. 494.

Nor does it make any difference that the attorneys or either of them obtained the outstanding title after plaintiff withdrew the abstract from their hands. It may be conceded that such withdrawal put an end to their employment, but that did not leave them free to buy in the title about which they had given their client advice, and then use it against him. Says Weeks: "An attorney cannot use information received by him from his client in opposition to the client. An attorney, for instance, who has been consulted respecting the title to lands, cannot afterwards become a purchaser of such lands from the state or from a third party, to use against his client. Such a purchase will inure to the benefit of the client. Weeks on Attorneys, secs. 277, 279. The relation of attorney and client is based and founded upon trust and confidence, and information acquired concerning the subject-matter of the employment, whilst the relation exists cannot be thereafter used by the attorney against the client. No system of jurisprudence with which we are acquainted permits such an abuse of the confidence and trust reposed in an attorney. It follows that plaintiff is entitled to the relief which he asks as against Leigh H. Irvine.

The next question is whether Louis C. Irvine took the title subject to the equitable rights of the plaintiff. Hefferman, it is to be remembered, conveyed the

undivided half of the outstanding title to Kribben. This deed was made at the instance of Leigh H. Irvine, and Kribben conveyed the same interest to Louis C. Irvine. Leigh H. Irvine procured a deed from Askew for the other half, and then conveyed the interest thus acquired to his brother Louis. All of the foregoing deeds were quitclaim in form. Louis then conveyed the lot to his mother, but this deed, it is conceded by Louis, was without consideration.

The attorneys, Leigh H. Irvine and Blair, were not called as witnesses. Louis C. Irvine testified on two occasions, one by deposition taken and read in evidence by the plaintiff, and again in his own behalf on the trial. In former years he had been a lawyer, but at the time in question was a real-estate dealer and speculator. He on both occasions states that he had no notice or knowledge that his brother and Blair had been employed to examine the plaintiff's abstract of title. In his deposition he says he did not know Kribben, had no dealings with him, and did not know who paid Kribben for the deed from Kribben to himself; that his brother used Kribben's name as a matter of convenience; that he purchased the property from his brother and Blair, and at his brother's request took the deed to the one-half from Kribben; that he did not examine the title but relied upon Blair's opinion as to it; that he knew his brother and Blair were purchasing the lot from Hefferman and Askew; and that there was in reality no consideration for the deed from himself to his mother. In his testimony given on the trial he says his attention was called to this property by his brother and Blair in conversations concerning invalid tax titles under a decision of this court; that they said they were looking up such titles and had a man searching the records and that money could be made out of them; that they talked more about this lot than about any other one; that the conversations lasted over a period of three or four months, and that he finally

bought this lot from them for $1,500, and gave them a note for $700 with a deed of trust back to secure it, $500 in cash and a receipt for $300 owing him by his brother.

The first deed to Louis bears date the fourteenth of September, 1887, and if he and his brother had conversations concerning the proposed purchase over a period of four months before it was made, then some of the conversations must have occurred during or near the time the plaintiff's abstract of title was in the hands of Leigh Irvine. It is perfectly clear that Leigh discovered the defects in the plaintiff's title when acting for plaintiff in the capacity of an attorney, and it seems reasonable that Louis must have had some information as to how and under what circumstances those defects were discovered. Louis, of course, knew that the plaintiff held the tax deed, and he took a bond from his brother Leigh to remove the cloud upon the title created by the tax deed. He purchased knowing that he must have a contest with the plaintiff as to the validity of the tax deed, and knowing that a conveyance of the property to his mother could not affect that contest. Why then make the deed to the mother without consideration unless there was some other claim against the property?

But it is not necessary to pursue this inquiry as to actual notice of plaintiff's equitable right to a definite conclusion. Louis claims under quitclaim deeds and nothing else, so the case concedes, though but one of them is found in the record. A purchaser by quitclaim deed, for value and without notice, acquires title, as against a prior unrecorded deed or other instrument conveying or affecting real estate; for such is the effect of our recording act. *Fox v. Hall*, 74 Mo. 315; *Boogher v. Neece*, 75 Mo. 383; *Willingham v. Hardin*, 75 Mo. 429; *Munson v. Ensor*, 94 Mo. 504; *Ebersole v. Rankin*, 102 Mo. 488; *Hope v. Blair*, 105 Mo. 90. But

the recording act does not apply to equities arising out of a breach or abuse of a trust relation. The facts constituting plaintiff's equitable right to hold the property as against Blair and Irvine could not be made matter of record under the recording act. The general rule which is recognized in the foregoing authorities, that one who takes title by quitclaim deed, which title is subject to equities in the hands of the grantor, takes subject to such equities, applies to this case.

As Mrs. Annie K. Irvine paid no consideration for the deed to her she occupies no better position than the other defendants. Indeed, it is not claimed that she does.

The plaintiff in his petition offered to pay into court for defendants the amount paid by Leigh H. Irvine for the outstanding title, conceded to be $200; and he renewed that offer in open court on the trial of this cause. This amount with interest the defendants are entitled to have refunded. *Baker v. Humphrey, supra; Davis v. Smith,* 43 Vt. 269–278.

The judgment in this case is, therefore, reversed and the cause remanded with directions to the circuit court to enter up a decree for the plaintiff divesting the defendants of all title acquired by the said several quitclaim deeds and the deed to Annie K. Irvine, and investing the same in the plaintiff upon the payment by the plaintiff into court for defendant the said $200 with interest thereon at six per cent. per annum from the eighth of October, 1887. All concur.