## GOLDEN GIANT MINING CO. v. HILL.

### SYLLABUS BY THE COURT.

1.   Expenditures made for work performed, labor done, and repairs made upon a stamp mill do not tend to develop the mineral claim, or facilitate the extraction of ore therefrom, and consequently do not constitute any part of the sum required to be expended for annual assessment or improvement work, under section 2324, U. S. Rev. St. (U. S. Comp. St. § 4620).                                                    P. 128

2.   Where one enters into possession of a mineral claim under a contract with a locator, by which the person entering undertakes to do the required assessment work, or do other work which would have been sufficient to constitute assessment work, he will not be heard to assert the forfeiture of the claim for nonperformance of the assessment work, where such nonperformance was the result of his own default, nor will he be permitted to take advantage, at any time, of the information obtained by him on account of such relation.
                                                              P. 136

3.   The failure to do the annual assessment work upon a mining claim does not of itself forfeit the claim, a relocation by a third party being essential to work a forfeiture of the original locator's rights.                                   P. 143

### ON SECOND MOTION FOR REHEARING.

4.   Where the trial court determined an issue as to whether there existed a fiduciacy relation between appellant and appellee, and by agreement of appellee permitted appellant to file an amended reply raising such issue, the question having been presented to the Supreme Court in the briefs of both parties, the issue was properly before the Supreme Court.
                                                              P. 144

Appeal from District Court, Grant County;

Action by the Golden Giant Mining Company against C. W. Hill. Judgment for defendant, and plaintiff appeals. On motion for rehearing. Reversed and remanded, with instructions.

K. K. Scott, of Breckenridge, Tex., and A. N. White, of Silver City, for appellant.

Wilson & Walton, of Silver City, for appellee.

### OPINION OF THE COURT.

BRICE, District Judge.   Heretofore we handed down an opinion reversing the judgment of the court below, but upon more mature consideration we are satisfied that we fell into error in some particulars in the former opinion.   That opinion will therefore be withdrawn.

This is an action brought by the Golden Giant Mining Company, a corporation, against C..W. Hill, to recover possession of two mining claims, resulting in a judgment against the plaintiff in the district court, from which it has prosecuted this appeal.

The facts briefly are as follows:

The appellant, Golden Giant Mining Company, is a domestic corporation, and for some time had been the owner of two unpatented lode mining claims in Grant county, located as the "Mammoth" and the "Ninety-six" claims.   One D. J. Hayden was its president, and the owner of 80,000 of its 100,000 shares of capital stock.   On January 16, 1915, the said Hayden and the appellee, Hill, entered into a written contract, whereby Hayden agreed to sell appellee 55,000 shares of his 80,000 shares of capital stock of the appellant corporation, to be paid for by the payment of $3,000 in cash, and $7,000 to be used:

"First, in the securing and paying a first-class engineer to examine the Golden Giant group of mines and the equipment thereof, and to formulate plans for successfully operating the same; second, in securing six Wilfry tables and one Huntington mill and installing the same, and in paying all expenses incurred in making all necessary improvements and repairs to the buildings, machinery, and equipments on said mining claims; third, in paying for all machinery, repairs, mechanics, material, and labor bills in putting the said Golden Giant mining plants and its accessories in perfect working condition and in operating the same continuously; fourth, in

opening up and putting in· perfect working condition the Golden Giant shafts and in operating the. same when put in shape so to do."

The balance of the purchase price for said stock was to be paid˙from mining operations upon the property. Appellee went into possession · of the mining property·in· February, 1915, under the terms of said contract with ·Hayden. He secured an assignment. to the corporation of a˙ certain outstanding lease to third parties of. the property, and which is mentioned in the contract. The improvements on the mining claims in controversy consisted of .houses, stamp mill, pumping plant, hoist, ·etc., of tne value of $25,000 or more, or at least the improvements cost this sum. .After taking possession of the mining properties, the appellee and associates spent $3,000 thereon for "labor and materials," as testified to by him, to be used to erect a tramway, "and everything for rebuilding˙ the˙ works inside, labor for shafting, money for bricks." These improvements were very largely made on the. stamp mill located on the claims, and none of ˙it was spent in the extraction of minerals, or the.˙development of the mining claims themselves. ˙

On June. 9, 1915,· appellee wrote Hayden a letter, showing that he was·operating the mining property under the terms of said contract. In this·letter he discouraged Hayden coming .to the mine to work, advising him that it would be cheaper to employ Mexican labor than to pay Hayden for anything· he could do, saying:

"And still until the mine will pay it is hardly worth your while to spend your time here."

Also:

"I think you had better accept the position mentioned or open ·an ·office and practice your profession.· You will then be with your family and you can resign or quit office at any time that the mine· or mill make enough money to let you live as ·a gentleman, and which I hope will not be long."

He further stated:

"I have got everything repaired (had to put new flues in boiler—rotted out), and the engine, mill, tables—everything running smooth; no belts coming off; no trouble to hold 80 pounds steam. Governor handles engine with throttle wide open; no choking of mill; and last Saturday we run all the old stuff in the mill and thoroughly tested everything out and it is all O. K. We have not done anything this week —waiting for repairs for hoist. * * * So I think we will be running next week with double shift, and as soon as Mr. R. is able to come down it will not be long until the floors are filled with other tables and appliances for saving values."

Also:

"I do not anticipate any trouble with mill and will do the assessment work if nothing else."

On August 6, 1915, the contract was canceled by mutual consent, and nothing further was done on the property during that year, although the appellee remained and resided in a house on the property until after the 1st of January, 1916.

After midnight on the 31st day of December, 1915, that is, on the morning of the 1st day of January, 1916, the appellee for himself began the relocation of the Mammoth claim under the name of "Hill No. 1," built a monument at one corner, and placed the required notice therein, and later complied with the law in putting up monuments and doing the necessary discovery work. On June 1, 1916, he relocated the "Ninety-Six" mining claim under the name of the "Bessie," and likewise complied with the law in the manner of locating and doing discovery work. He has been in possession of said claims since said attempted relocation.

Appellant, on December 31, 1915, filed for record its proof of labor on the two claims as follows:

"On the Ninety-Six (96) lode mining claim installation of new flues in boiler to the approximate cost of twenty-five dollars ($25.00); mucking out and retimbering eighty (80) foot tunnel to the approximate cost of seventy-five dollars ($75.00); erection of water filter in gulch to the approximate

cost of twenty-five dollars ($25.00); repairs on pump, pipe line and on watering works to the approximate cost of twenty-five dollars ($25.00).

"And on the Mammoth lode mining claims resetting Wilfrey tables on cement pillars and repairing mill and buildings, etc., of the approximate cost of two hundred fifty dollars ($250.00); building tramway from gulch to top of hill of the approximate cost of one hundred fifty dollars ($150.00); repairing engine and boiler to the approximate cost of fifty dollars ($50.00); overhauling hoist to the approximate cost of fifty dollars ($50.00)."

Appellee and other witnesses on his behalf testified, with reference to the work done, that on the Ninety-Six claim it was all done for the purpose of running the mill, and did not tend to develop, or afford any means for the extraction of ores from the claim. Appellee testified that the tunnel was not retimbered, but was only cleaned out, but did not deny that $75 was spent thereon, also that the tunnel was used to furnish water for the mill; that no work by way of shafts or tunnels was done on the claims in 1915. The evidence clearly supports appellant's proof of labor on the Mammoth, but all such work done was in connection with the stamp mill situated on the premises. Such expenditures were not made by the corporation, but were made by appellee under his contract with Hayden, and by appellee's associates, Flores and Randin, who were stockholders of the corporation. The amount expended was something over $3,000.

[1] It is apparent from the foregoing statement of facts that the question is clearly presented as to what kind of labor or improvements upon a mining claim will satisfy the requirements of the federal statute (section 2324, R. S. U. S. [U. S. Comp. St. § 4620]) in regard to annual expenditures. In this case no work was performed upon either of these two mining claims for the purpose of developing them as mining claims, or for the purpose of facilitating the extraction of ores therefrom. The money was expended upon a mill for the purpose of putting

the same in running order for the treatment of some tailings, on or near the premises, and of such ores as might thereafter be extracted from the mines themselves. We assume that the repair of the mill would constitute annual labor or improvement as much as the construction of the mill in the first instance. If one will satisfy the requirements of the statutes as to annual expenditure, the other would likewise do so. The question is, Will the erection or repair of a mill upon a mining claim, or group of claims, designed to treat and reduce the ores from said mines, satisfy the requirements of the federal statute in regard to the annual expenditure required to hold the claim? The federal statute (section 2324, R. S. U. S.), among other things, provides:

"On each claim located after the tenth day of May, eighteen hundred seventy-two, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year. * * * And upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made. * * * "

Just what character of labor or improvements is required is not specified in the statute. The Land Department of the government has taken a definite stand upon this question, and is firmly committed to the doctrine that the labor or improvements contemplated by the federal statutes are such as bear some direct relation to the development of the mine, and which tends to facilitate the extraction of ores therefrom.

In Monster Lode Mining Claim, 35 Land Dec. 493, the question was as to whether a stamp mill upon a mine, used exclusively for that mine, could be considered an improvement going to make up the required expenditure of $500 in order to obtain the patent. The Secretary of the Interior held that it was not, quoting from Highland Marie and Manila Lode Mining Claims, 31 Land Dec. 37, and citing

Smelting Co. v. Kemp, 104 U. S. 636, 655, 26 L. Ed. 875, and other land decisions.

In Highland Marie and Manila Lode Mining Claims, 31 Land Dec. 37, it is pointed out that, while in a sense the mill promotes the development of the mine, because it enables the owner to reduce the ores without freighting them to reduction work, the relation of the mill to the mine is too remote to be said to facilitate the development of the mine and the extraction of ores therefrom. The Secretary of the Interior cited and relied upon Smelting Co. v. Kemp, 104 U. S. 636, 655, 26 L. Ed. 875. In Schrim-Carey and Other Placers, 37 Land Dec. 371, a lime kiln was held not to be an improvement on a placer claim, located upon the lime deposit, within the requirements of the statute. In Fargo Group No. 2 Lode Claims, 37 Land Dec. 404, a road partly on and partly off a mining claim, used to transport machinery and supplies to and ore from the mine, is held not to be an improvement within the $500 requirements for patent. In Zephyr and Other Lode Mining Claims, 30 Land Dec. 510, it is held that work done according to a system for the development of a group of contiguous claims owned by one person is to be considered as an improvement within the $500 requirement.

The Secretary of the Interior points out that the same kind of improvements required annually are required under the $500 expenditure section of the federal statute, and for that reason the kind of improvement in that case was held to be sufficient for a patent.

In Smelting Co. v. Kemp, 104 U. S. 636, 655, 26 L. Ed. 875, the principal question was whether in a court of law a patent to a mining claim might be collaterally attacked because the land officers had made a mistake of law in issuing the same, and the court held that it could not. In the course of the discussion, however, Mr. Justice Field defined the

meaning of the words "labor" and "improvements" under the federal statute, and said that they mean such labor and improvements as are performed or made for the development of the mine to facilitate the extraction of the metals it may contain.  In his definition he included such improvements as are applicable to placer mining, and says that the work or improvement may "be at a distance from the claim itself, as where the labor is performed for the turning of a stream or the introduction of water, or where the improvement consists in the construction of a flume to carry off the debris or waste material." This statement in no way modifies the general doctrine previously stated by him, namely, that the labor or improvement which satisfies the statute is something which directly facilitates the development of the mine and the extraction of ores therefrom, because in the case of a placer mine the diverting of a stream of water is necessary for the purpose of extracting the ores from the gravel, and a flume to carry away the debris is necessary in order that the mining may be continued.  This definition of the statutory requirements is perhaps the earliest after the adoption of the statute.

In Fredricks v. Klauser, 52 Or. 110, 118, 96 Pac. 679, 682, the court said:

"There was no machinery or other fixtures of importance at the mines, the preservation of which necessitated a watchman, when the development work had ceased, and, this being so, the worth of the actual labor performed by Arbuckle in endeavoring to increase the world's wealth by making an honest effort to discover valuable minerals is the only credit to which he is entitled."

It is further said in this case:

"The word 'improvement,' as thus used, evidently means such an artificial change of the physical conditions of the earth in, upon, or so reasonably near a mining claim as to evidence a design to discover mineral therein or to facilitate its extraction, and in all cases the alteration must reasonably be permanent in character."

In Altoona Quicksilver Mining Co. v. Integral Quicksilver Mining Co., 114 Cal. 100, 45 Pac. 1047, the jury had been instructed that annual expenditure might consist in digging, etc., "or, if the mine be idle, it may consist of the services of a watchman or custodian in looking after the property and taking care of the same." The court said:

"To constitute a general rule, this would require some qualification. If this sort of care was necessary to preserve tunnels, buildings, or any structures erected to work the mine, and which would be necessary in case work were resumed, 1 see no reason why it would not constitute work upon the mine as much as the erection of such structures in the first instance would. But if there was only the naked claim to be looked after, and a watchman were placed there merely to warn prospectors, and thus prevent a relocation, it would not be labor upon the mine in the sense of the statute."

In Hough v. Hunt, 138 Cal. 142, 70 Pac. 1059, 94 Am. St. Rep. 17, the same court in discussing whether the services of a watchman could be held to be assessment work, pointed out when and when not the same would be allowable as annual expenditures, and held that, where there were structures upon the mine which were likely to be lost if not cared for, and the structures would be required when work would be resumed, the services of a watchman might be allowed as assessment work.

In Merchants' National Bank v. McKeown, 60 Or. 325, 119 Pac. 334, the court said:

"The expense of the keeper is only allowable as annual labor when the mine is temporarily idle and the work is to be resumed again, the watchman being necessary to preserve the property needed when the work is resumed, and cannot be so applied from year to year indefinitely as a substitute for the annual labor."

In Doherty v. Morris, 17 Colo. 105, 28 Pac. 85, the court held that labor performed by the owner of a mine in constructing a wagon road thereto for the purpose of better developing and operating the same may be treated as a compliance with the law, relating to the annual assessment work thereon.

The decision was based upon the language used in Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875, and the application of the doctrine that work done outside of the claim may be work done on the claim is applied to a road.

In Nevada Exploration & Mining Co. v. Spriggs, 41 Utah 171, 181, 124 Pac. 770, 773 the court was discussing the principle that a system or plan of development was sufficient to meet the requirement of the annual expenditure on each of a group of claims, and in that connection said:

"We think that what is intended by the use of the term 'system' or 'general system' of work means simply this: That the work, as it is commenced on the ground, is such that, if continued, will lead to a discovery and development of the veins or ore bodies that are supposed to be in the claims, or, if these are known, that the work will facilitate the extraction of the ores and mineral."

It was upon this theory that the Utah court cited Doherty v. Morris, 17 Colo. 105, 28 Pac. 85, and approved the same. But it is to be noticed that the court adhered to the proposition that work, in order to comply with the annual expenditure requirement, must be calculated to facilitate the discovery in or extraction of ores from the mine.

In Book v. Justice Mining Co. (C. C.), 58 Fed. 113, the court was likewise discussing the principle which allows work to be done outside of or upon one of a group of claims for the benefit of all. But in that case the doctrine is reiterated that such work must be done for the purpose of prospecting or developing the mine.

In Power v. Sla, 24 Mont. 243, 61 Pac. 468, while the court had under consideration the question of pleading, it nevertheless adhered to the same doctrine that the annual expenditure, in order to hold a mining claim, must be made for the development of the claim and to facilitate the extraction of the minerals it may contain.

In Lockhart v. Rollins, 2 Idaho, 540, 21 Pac. 413, a man had been employed as a watchman to take care of the buildings and improvements upon a mining claim at a salary of $500 a year. The improvements consisted of buildings, engine, boiler, machinery, hoisting works, etc., which were used in the development of the mine. The court held that the services of this watchman fulfilled the requirements of the federal statute; but it is to be observed that the improvements consisted of the instrumentalities necessary to be used, and which had been used by the owners in the actual working and development of the mine. In this case there are cited several cases in which the question was as to whether certain kinds of labor upon a mine would entitle the person performing the same to a mechanic's lien. This part of the opinion we do not regard as sound. Work and labor upon a mine within a mechanic's lien statute may or may not be the same thing as work and labor upon a mining claim within the requirements of the annual expenditure statute. The two requirements are founded upon an entirely and distinct principle.

In Snyder on Mines, § 498, the doctrine of the cases is summarized as follows:

"The test in all cases which should be applied to 'annual' labor' is whether the work or improvements tend to develop the claim, and facilitate the extraction of the mineral and valuable contents therefrom. Any labor or improvements meeting this requirement will satisfy the statute; nothing else will."

In Lindley on Mines (3d Ed.) § 629, it is said:

"A stamp mill, even though located upon and used exclusively in connection with that particular mining claim, is not a satisfactory improvement, for it does not facilitate the extraction of the mineral from the claim; and the same rule applies to a lime kiln and to excavation for the foundation of a smelter."

In Sexton v. Washington, etc., Co., 55 Wash. 389, 104 Pac. 614, a road built into a small unorganized

mining district by all the miners owning claims it was held might be considered as work upon and for the development of all such claims, citing with approval Doherty v. Morris, 17 Colo. 105, 28 Pac. 85. This case certainly goes to great length in the application of the doctrine in regard to roads serving as annual assessment work.

We have made a thorough examination of all the cases upon this subject, and find a comparative unanimity of opinion. The cases all, in effect, agree that work and labor or improvements to satisfy the statute must bear some direct relation to the development of the claim or the extraction of ores therefrom. In the case of labor actually performed in mining or improvements in the way of hoisting machinery, there is no difficulty. The relation of the same to the improvement of the claim is direct and apparent. In the case of a watchman, where he guards and protects machinery or improvements directly connected with the mining operations upon the property, there can be no controversy as to the applicability of such work as annual expenditure. In the case of roads over which machinery and supplies for the development and working of the mine are hauled to the mine, and ore is hauled from the mine, the applicability is less direct and logical. It may be said, however, that if hoisting machinery with which waste and ores are to be removed from the mine is an improvement, a road over which such machinery is hauled to the mine is likewise such an improvement. So it may be said that such road over which the ore, when raised to the surface, may be hauled directly facilitates the development of the mine and the extraction of the ores, because they must be removed from the shaft or tunnel in order to continue the mining operations. In this sense the holding that the services of a watchman and the building of roads is work upon the mine is justifiable.

On the other hand, it is to be observed in this connection that the federal statutes contain not a single word relative to the reduction of ores and the extraction of the precious metals therefrom. The legislation on the subject deals solely with mining operations, and Congress has not concerned itself by a single expression with reduction works or the reduction of ores, except in section 2337, R. S. U. S. (U. S. Comp. St. § 4645), which provides that five acres of noncontiguous, nonmineral land may be embraced and included in an application for a patent for a lode claim, and that the owner of a quartz mill or reduction works, not owning a mine in connection therewith, may likewise receive a patent for his mill site. It is contemplated by the congressional legislation therefore that reduction works are to be separate and apart from mining operations, and mill sites upon which reduction works are to be erected by the owner of a claim must consist of noncontiguous and nonmineral lands. No annual expenditure is required to be made upon mill sites, and the improvements thereon bear no relation whatever to the mining operations in so far as the federal legislation is concerned. A mill erected upon noncontiguous and nonmineral lands would as much facilitate the development of a mine in connection therewith as a mill erected upon the mine itself, and yet no one would contend, we believe, that such an improvement would satisfy the requirements of the federal statute.

From what has been said it would seem clear that the work and labor performed, and repairs made upon the mill in question in this case do not meet the requirements of the federal statute in regard to annual expenditure upon the mining claims of the appellant.

[2]    The district court held: That at the time of the relocation of the ground in controversy by the appellee he occupied no fiduciary, contractual, or other relation with the appellant, so as to preclude

Golden Giant M. Co. v. Hill, 27 N. M. 124.

him from making such relocation. An issue was made in the pleadings in this regard, and presented in the briefs of the parties in this court. The relation existing between the parties at the time appears from the statements of facts, which inferentially are drawn from the evidence, and in our judgment no other inference could be drawn therefrom. That at the time or prior to the cancellation of the contract between appellee and Hayden the appellee conceived the idea of relocating the mines for his own benefit and in his own name. This inference is drawn from the fact that he remained in a house upon the mine and lived there for several months after the termination of the contract, and did attempt to relocate the land at the very first opportunity. The explanation given by him to the effect that he had no money to go elsewhere is so unreasonable that it cannot be taken as substantial evidence in the face of his acts in connection therewith. He apparently had sufficient means for subsistence without labor during this time, and was only away once from the claim for a few days. We can easily understand that he might not have the means to remain upon the claim without work to obtain them, but our reason will not be convinced that he remained upon the claim without other reason than that he had no means to go elsewhere. The evidence shows that appellee had no particular knowledge of the value of the mine or its improvements, nor had he seen it, until after he went into possession under the terms of the contract with Hayden. That the information he had with reference to the mine of material value was obtained by him while it was in his possession under the contract to purchase the controlling interest. While he had no contract with the corporation, his contract with its principal stockholder, under which he took and held possession for six months during the year 1915, created such a relation with Hayden as that would preclude him from relocating the same to Hayden's disad-

vantage to the same extent as had such contract been directly with the corporation. The contract provided that all improvements placed upon the mine by appellee should vest in the corporation in case of its cancellation, so that the corporation was a beneficiary in the contract, and to that extent interested therein.

Under the law a mine owner has the whole calendar year within which to do the assessment work, and he is not limited to doing any particular part of it at any particular time. 2 Lindley on Mines, § 624. But the duty to perform exists during all of that time, and one in possession under contract to purchase, or under a lease, is duty bound to perform the annual assessment work to prevent a forfeiture by relocation.

In the case of Godfrey v. Faust, 18 S. D. 567, 101 N. W. 718, the Boston & S. D. Company, through its superintendent, had a contract for the purchase of the Dave and Faust lodes, and their superintendent did the necessary representation work upon the mines. It was contended that this was not proper, as they were not authorized to do the work. The court said:

"The work, therefore, done by the Boston & S. D. Co. under the contract above referred to, inured to the benefit of the defendant, as it was not only the right of the Boston & S. D. Co. to do the assessment work, but, being in possession upon this contract, it was its duty to do the work in order to preserve the defendant's right to the property."

In the case of Lowry v. Silver City, etc., Mining Co., 179 U. S. 196, 21 Sup. Ct. 104, 45 L. Ed. 151, lessors of a mining claim attempted to make relocation thereof, and the Supreme Court of the United States said:

"This was plainly an attempt on the part of the plaintiffs in error—two of whom were lessees of the defendant in error—under the forms of law to appropriate to themselves property which for years had been in the unchallenged possession of the defendant in error, and upon which it had expended

many hundreds of dollars. That such attempt was unsuccessful in the courts is no more than was to be expected.

"The Supreme Court of the state placed its decisions upon two grounds: First, that although the Evening Star claim included the original discovery shaft of the Wheeler claim, it did not thereby destroy that claim, in view of the fact that long prior to the location of the Evening Star the owners of the Wheeler had located a new shaft and developed the mine in that shaft. * * * The other ground was estoppel, by virtue of the lease under which two of the plaintiffs in error acquired possession. While the former ground is the one principally discussed in the opinion, the latter was adverted to in a few words at its close. The latter is sufficient to dispose of the case in this court."

In the case of Stewart et al. v. Westlake, 148 Fed. 349, 78 C. C. A. 341, it was held that the lessor of a mining claim, who was in possession and who had contracted to do work upon the claim that would be sufficient for the assessment work, and who relocated the claim in the name of third parties, obtained no right. The court said:

"The law of the case is well settled. The lessee of a mining claim who has contracted to do an amount of work thereon which would be a sufficient compliance with the legal requirements in respect of development, and also to notify the lessor of any intention to surrender or abandon the lease, cannot, upon failing to perform his obligations, secretly relocate the claim, and so secure and hold for himself the title. A patent obtained under such circumstances will be decreed to be held in trust for the lessor."

The testimony shows that the appellee recognized his duty to perform the assessment work. In his correspondence with Hayden he agreed to do this, if nothing more. If he had done the work contemplated by the terms of his contract, there would have been no question but what sufficient labor or improvements would have been performed or made upon the claim to have satisfied the law. It was just as much his duty to perform the assessment work during the six months in which he had possession of the claim as it was for the appellant to do it during the other six months. He failed in his

duty, if the work was not done, as much as the appellant, and now seeks to take advantage of his failure to perform the labor which he recognized was his duty to perform and to use the information he obtained under his contract with Hayden to further his own interests. His relation placed him in a position where he could injure Hayden and the appellant, just as though he had been their confidential agent, and persons placed in such a position are not permitted to take advantage of the information obtained thereby, even after the relation has ceased. 1 Mechem on Agency, §§ 1209, 1210, 1216, 1217, 1218; Ringo v. Binns, 10 Pet. 269, 9 L. Ed. 420; Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176.

The case of Trice v. Comstock, supra, reviews the authorities generally on this subject. In that case, Trice and Beemer, real estate men, had a tract of land listed with them, although they had no contract to purchase. They employed Rietmeyer and Comstock to secure purchasers for this and other lands. After obtaining information as to the value of this land during the time they were so employed, the agency was canceled. Thereafter Comstock bought the land himself. In a suit to hold them constructive trustees, the court said:

"Nor is it any defense to the suit to enforce this trust that the agency had terminated before the confidence was violated. The duty of an attorney to be true to his client, or of any agent to be faithful to his principal, does not cease when the employment ends, and it cannot be renounced at will by the termination of the relation. It is as sacred and inviolable after as before the expiration of its term. Eoff v. Irvine, 108 Mo. 378, 383, 18 S. W. 907, 32 Am. St. Rep. 609; Robb v. Green [1895] 2 Q. B. 315, 317-320; Louis v. Smellie [1895] 73 Law Times (N. S.) 226, 228. * * *

"Nor was discretion or authority to sell these 1,925 acres of land requisite to disable this agent from buying and holding them adversely to his principals. Every agency creates a fiduciary relation, and every agent, however limited his authority, is disabled from using any information or advantage he acquires through his agency, either to acquire property or to do any other act which defeats or hinders the

Golden Giant M. Co. v. Hill, 27 N. M. 124.

efforts of his principals to accomplish the purpose for which the agency was established. In Gardner v. Ogden, 22 N. Y. 327, 343, 350, 78 Am. Dec. 192, the clerk of the brokers of the plaintiffs, was held to be disabled from buying plaintiff's property, although he never had any discretion or authority relative to the sale of it. In Winn v. Dillon, 27 Miss. 494, 497, Dillon was declared to be disabled from purchasing the lands he acquired, although the only authority he ever had was to search out and report their descriptions. In Davis v. Hamlin, 108 Ill. 39, 49, 48 Am. Rep. 541, an agent of a lessee to procure amusements for his theater, who never had any authority to deal with the leasehold estate, was held to be disabled from taking a renewal of the lease himself, and was adjudged to hold the leasehold interest which he had secured for the exclusive use and benefit of his principal.

"The truth is that the principle of law which controls the determination of this case is not limited or conditioned by the interest, powers, or injuries of the parties to the fiduciary relations. It is as broad, general, and universal as the relations themselves, and it charges everything acquired by the use of knowledge secured by virtue of these trust relations and in violation of the duty of fidelity imposed thereby with a constructive trust for the benefit of the parties whose confidence is betrayed. It dominates and controls the relation of attorney and client, principal and agent, employer and trusted employee, as completely as the relation of trustee and cestui que trust. In Greenlaw v. King, 5 Jur. 19, Lord Chancellor Cottenham, speaking of this doctrine, says: 'The rule was one of universal application, affecting all persons who came within its principle, which was that no party can be permitted to purchase an interest when he had a duty to perform which was inconsistent with the character of a purchaser.' * * *

"The rule upon this subject was clearly and broadly stated in the American note to Keech v. Sanford, 1 White & T. Lead. Cas. in Eq. (4th Am. Ed.) p. 62, *page 58, in these words: 'Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated.'

"The facts of the case in hand brought it squarely within this rule, charged the title which the agent Comstock acquired with a constructive trust for the benefit of his principals, and furnished substantial ground for their application to a court of equity for appropriate relief. * * *

"But the fiduciary relation through which agent C. W. Comstock procured his information and knowledge of the

location, character, and value of this tract of land, his acceptance of the agency, his leading of the probable purchaser to the property, his receipt from his principals of the expenses of this trip, forbade him from purchasing this land for himself, and thereby preventing his principals from affecting a sale of it, and charged it in his hands with a constructive trust in their favor."

In the case of Eoff v. Irvine, 108 Mo. 378, 18 S. W. 907, 32 Am. St. Rep. 609, the Supreme Court of Missouri held that an attorney who had been consulted with reference to the title to property, and having given advice in connection therewith, although his employment was repudiated by the owner of the land, yet he was precluded from purchasing an outstanding title, the information with reference thereto having been obtained from an abstract furnished him by the owner of the land, notwithstanding the relation had long terminated.

There are many cases decided by the courts holding that a person occupying fiduciary relations with the owner of a mining claim is precluded from relocating the same. Lockard v. Rollins, 2 Idaho (Hasb.) 540, 21 Pac. 414, Argentine Mining Co. v. Benedict, 18 Utah 183, 55 Pac. 559; O'Neill v. Otero, 15 N. M. 707, 113 Pac. 614; Largey v. Bartlett, 18 Mont. 265, 44 Pac. 965; Fisher v. Seymour, 23 Colo. 542, 49 Pac. 32, Lockhart v. Leeds, 195 U. S. 427, 25 Sup. Ct. 76, 49 L. Ed. 263; Lowry v. Mining Co., 179 U. S. 196, 21 Sup. Ct. 104, 45 L. Ed. 151; Ball v. Dolan, 18 S. D. 558, 101 N. 719; Utah Mining & Mfg. Co. v. Dickert, etc., Co., 6 Utah 183, 21 Pac. 1002, 5 L. R. A. 259.

"With reference to what occurs after the agency is ended, it is not generally true that the duty and responsibility of the agent terminates with the agency. On the other hand, there is, as has been seen, a considerable class of cases in which it is held that an agent will not be permitted, after the termination of his agency, to take advantage of information which he acquired in a confidential capacity, during the agency, respecting the principal's business plans or purposes to obtain for himself rights or interests which he thus learns that the principal intended to acquire and the acquisition of

which by the agent would defeat the purposes of the principal" (citing Trice v. Comstock, 121 Fed. 620; Eoff v. Irvine, 108 Mo. 378, 32 A. S. R. 609; Dennison v. Aldrich, 114 Mo. App. 700). 1 Mechem on Agency, par. 1235.

The principle involved is not unlike that in the case of Lockhart v. Mining Co., 16 N. M. 237, 117 Pac. 837, in which Mr. Justice Parker, in summing up the case, said:

"We have thus a case pleaded, proved, and found by the court as follows: A prospector under contract posts a location notice and initiates a location; he is charged with the duty of performing the several acts of location; he enters into a fraudulent conspiracy to refrain from perfecting the location and to cause a forfeiture thereby; he does refrain from doing said acts and, upon forfeiture, delivers possession to the conspirators. This certainly makes out a case, and, irrespective of the other allegations in the complaint, entitles the plaintiff to the relief sought."

[3] The failure to do the annual assessment work required by the federal statute does not forfeit a mining claim, but it requires the intervention of a third party and a relocation of the ground. 2 Lindley on Mines, § 651; 1 Snyder on Mines, § 560; Morrison's Mining Rights, p. 128.

"Although the owner of a location has failed to do the necessary assessment work, so that the ground is subject to a relocation, yet if, before any such relocation by others, he perform the amount of assessment work required by the statute, then his rights are revived, and a subsequent relocation is invalid." Justice Mining Co. v. Barclay et al. (C. C.) 82 Fed. 554.

So that at the time the appellee attempted a relocation of the mine the appellant's interest therein had not forfeited, but was only subject to forfeiture. The proofs of assessment work made by appellant were filed on the 31st day of December, from which it might be inferred that, depending upon appellee to do this assessment work, the making of these proofs was delayed until it was impossible to do other work. This, however, would be immaterial as

the rights of the appellant would be intact except for the unlawful acts of the appellee.

Other questions are raised which we do not find it necessary to decide.

The motion for rehearing will be denied, and the judgment of the court will be reversed, and the cause remanded, with instructions to enter judgment for the appellant, and it is so ordered.

ROBERTS, C. J., and PARKER, J., concur.

ON SECOND MOTION FOR REHEARING.

BRICE, District Judge. Appellee contends that the Supreme Court had no jurisdiction to entertain or consider this appeal, because it was allowed more than one year after the rendition and entry of the final judgment. This question was heretofore raised in this case on the 19th day of September, 1918, by a motion to dismiss. This motion was overruled without an opinion on January 8, 1919, under the authority of Romero v. McIntosh, 19 N. M. 612, 145 Pac. 254, and no motion for rehearing of that question was filed. Thereafter the case was submitted on its merits, and reversed and rendered in favor of appellant on August 19, 1919, and a motion for rehearing was overruled February 14, 1921. This question was not raised in appellee's original brief on the merits, nor in his motion for rehearing, and now it is sought to have us review our original action in overruling the motion to dismiss this appeal by a second motion for rehearing on the merits. Under these circumstances, this court will not, at this time, review its former action.

[4] It is further contended that no issue appears in the pleadings that would authorize the Supreme Court to consider the question of whether or not there existed such fiduciary relations between appellant and appellee, as would preclude appellee from making a relocation. The trial court decided this question, and by agreement of appellee permitted appellant to file an amended reply raising this issue.

The district court having determined the question, and it having been presented to the Supreme Court in the briefs of both parties, the issue was properly before the Supreme Court. Canavan v. Canavan, 17 N. M. 503, 131 Pac. 493, Ann. Cas. 1915B, 1064.

The third point raised is to the effect that there is nothing in the testimony offered by plaintiff to sustain its claim of estoppel against defendant that would preclude the defendant from making relocations. This question has been heretofore thoroughly considered by the court and its decision based thereon. Our reasons are given at length in the opinion filed upon the first motion for rehearing, and we find no reason for changing the views expressed in that opinion, and adhere thereto.

The second motion for a rehearing is overruled, and it is so ordered.

ROBERTS, C. J., and PARKER, J., concur.