**GROUP ASSOCIATION PLANS, INC.**

v.

**David B. COLQUHOUN**
and
**Raymond K. Tongue Co., Inc., Appellants.**

**No. 71–1226.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 9, 1972.

Decided Aug. 22, 1972.

Rehearing Denied Aug. 30, 1972.

Messrs. Jack L. Lahr, Washington, D. C., and Lawrence F. Henneberger, Wheaton, Md., with whom Messrs. Earl W. Kintner and Donald M. Barnes, Washington, D. C., were on the brief, for appellee.

Before Mr. Justice CLARK,* of the Supreme Court of the United States, and TAMM and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This is an action for breach of contractual and common law duties to a former employer.

I. *Facts*

In June 1963 David Colquhoun, one of the two appellants here, began work as a group insurance salesman for appellee Group Association Plans, Inc. (GAP), with responsibility for the sales, solicitation and servicing of group insurance for membership associations. From 1 June 1964 until 31 May 1966 Colquhoun was employed by GAP pursuant to a written employment contract containing a restrictive "non-competition" covenant, which provided

> that Colquhoun will not, for ten (10) years after the expiration or other termination of the term of this agreement, directly or indirectly . . . seek, solicit or accept any business of or with any person, firm, corporation, association, organization or group of any kind, which at any time during Colquhoun's employment with the Company, is or was a customer or client of the Company, or any company, venture or corporation, owned or controlled by the Company or the stockholders of the Company.

By the spring of 1966 Colquhoun had become dissatisfied with the conditions of his employment at GAP and had begun discussions with Robert L. Larsen, Vice President of appellant R. K. Tongue, Inc., another group insurance broker-agent, regarding possible employment. On 23 May 1966, at a meeting with the top officers of R. K. Tongue, he was presented with an employment contract. On 31 May 1966, the last day of the term of his employment contract with GAP, he met again with R. K. Tongue officials, and reached agreement on salary. Colquhoun's employment with GAP ceased, under the terms of the employment contract, on 31 May 1966; he also submitted, on that day, a letter of resignation to GAP, and on the day following began work for R. K. Tongue.

Prior to the termination of his employment with GAP, Colquhoun had represented GAP in soliciting the group insurance business of three associations relevant here. At the time he left the employ of GAP the three associations had not agreed to employ GAP as their group insurance broker, and thus might be termed "prospective customers" of GAP. After Colquhoun began his employment with R. K. Tongue, he again solicited the insurance business of these

* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a) (1970).

three associations, this time on behalf of his new employer. With two of these three companies, the National Rehabilitation Association (NRA) and the Society of American Registered Architects (SARA), the solicitation was ultimately successful. The activity of Colquhoun in soliciting these three programs on behalf of R. K. Tongue, and R. K. Tongue's profits derived therefrom, create the issues in the case at bar.

## II. *Proceedings Below*

GAP's Amended Complaint charges, *inter alia*, that Colquhoun breached the non-competition clause of his contract of employment with GAP; that R. K. Tongue wrongfully interfered with, and wrongfully induced Colquhoun to breach the contract; and that R. K. Tongue and Colquhoun wrongfully conspired to interfere with GAP's contractual and business relationships with the two prospective customers discussed *supra*.

After extensive discovery and a trial before the late United States District Judge Alexander Holtzoff, sitting without a jury, Judge Holtzoff filed his opinion holding that because of the breach of a common law duty Colquhoun and R. K. Tongue should be permanently enjoined "from continuing and accepting the fruits of the illegal course of action to which the Court has referred . . . ."[1] Further, Judge Holtzoff awarded money damages against R. K. Tongue as to the prospective customers "to whom the individual defendant succeeded in selling insurance plans in behalf of his new employer."[2] Judge Holtzoff referred the matter to a deputy auditor and provided that "[t]he measure of damages is the income derived by the corporate defendant, the new employer, from the business done with these three concerns, less the expenses incurred in conducting it."[3]

After a hearing, the deputy auditor recommended damages of $68,295.00,

subject to a six percent interest and discount rate factor. On 20 January 1971 District Judge Gasch ordered that the report of the deputy auditor be confirmed and that judgment be entered against R. K. Tongue in the amount of $68,295.00, subject to the computation of the interest and discount. From this order R. K. Tongue and Colquhoun have appealed.

Only three issues need be considered here: (1) whether District Judge Holtzoff complied with Federal Rule of Civil Procedure 52(a) in making his finding of R. K. Tongue's liability; (2) whether the District Judge was correct in his statement of Colquhoun's common law duty to his former employer; and (3) whether the monetary damages were properly computed. Having concluded that appellants prevail on two of these issues, we vacate the judgment and remand the case to the District Court for further proceedings.

## III. *The Rule 52(a) Issue*

■ R. K. Tongue's liability in the case at bar is governed by the principle well stated in American Republic Insurance Co. v. Union Fidelity Life Insurance Co.: "A company which knowingly participates in, encourages, and accepts the benefits of, acts of unfair competition committed by a person against his former employer is liable for those acts."[4] In *American Republic* the court explicitly found that the employee was hired by his new employers because they thought that "he could transfer his organization and business to [them]."[5]

■ In Judge Holtzoff's opinion in the case at bar, however, there is no such finding, and indeed there is no finding whatever that sheds any light on the motives of R. K. Tongue for hiring Colquhoun. Rule 52(a) requires that "the court shall find the facts specially and state separately its conclusions of

---

1. Group Association Plans, Inc. v. Colquhoun, 292 F.Supp. 564, 568 (D.D.C. 1968).

2. *Ibid.*

3. *Ibid.*

4. 295 F.Supp. 553, 556 (D.Or.1968).

5. *Id.,* at 555.

law thereon," but there is nothing in Judge Holtzoff's opinion which indicates the facts on which he based his legal conclusion as to R. K. Tongue's liability. There appear to be indications in the record that R. K. Tongue might have been aware of Colquhoun's dealings with NRA and SARA on behalf of Group Association Plans, but the evidence is not clear-cut, and Rule 52(a) requires the court to state on which facts the decision of liability is based. Without such a statement, an intelligent review of the lower court's factual considerations and resulting legal conclusions is impossible. With regard to R. K. Tongue's liability, this omission is a fatal defect; we thus remand for such consideration and statement.

In the proceedings now to be held in the District Court, a new judge will examine the record and make the required factual and legal determinations regarding R. K. Tongue's liability. If the District Judge decides that he can make such determinations on the record as it now stands, he may do so; otherwise, a new trial will be necessary.

## IV. *Colquhoun's Common Law Duty*

R. K. Tongue's liability is, of course, predicated on Colquhoun's liability to Group Association Plans, whether for breach of contract or breach of a common law duty to a former employer. Judge Holtzoff's opinion ruled out contract as a basis for recovery, and went on common law grounds. On the remand we do not bar reconsideration of contractual liability, see *infra*, but we think it helpful to set forth the common law liability.

One of the most elaborate discussions of an employee's common law duty to his employer is to be found in *Trice* v. *Comstock.*[6] The views of Judge Sanborn in *Trice* are worth quoting at some length:

For reasons of public policy, founded in a profound knowledge of the human intellect and of the motives that in-

spire the actions of men, the law peremptorily forbids everyone who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation. If one ignores or violates this prohibition, the law charges the interest or the property which he acquires in this way with a trust for the benefit of the other party to the relation, at the option of the latter, while it denies to the former all commission or compensation for his services.

\* \* \* \* \* \*

The only indispensable elements of a good cause of action to enforce such a trust are the fiduciary relation and the use by one of the parties to it of the knowledge or the interest he acquired through it to prevent the other from accomplishing the purpose of the relation.

\* \* \* \* \* \*

And, within the prohibition of this rule of law, every relation in which the duty of fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence. The relation of trustee and cestui que trust, *principal and agent*, client and attorney, *employer and employee*, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of the relation.[7]

Comstock, the agent, used the knowledge that he had acquired in working for his principals (Trice, *et al.*) for his own gain, to buy land in which they were interested. The business of Trice, in connection with which he had employed Comstock, was to buy and sell land. Comstock was engaged to find a buyer for a parcel of land which Trice hoped (and contracted) to obtain at a relatively low price. After some nego-

---

6.  121 F. 620 (8th Cir., 1903).

7.  121 F., at 622–623 (emphasis supplied).

tiations (which were apparently never completed) with a prospective buyer, and after having learned the character and details of the land in question, Comstock himself (by virtue of some rather shady dealings involving his brother) acquired title to the land which Trice had hoped to obtain for resale.

The *Trice* court held that this conduct on the part of Comstock was a breach of the common law duty that he owed his principal.

> The law imposed upon this agent, Comstock, the duty to use all the knowledge and all the benefits he derived from his agency to accomplish the purpose of his principals, and it implied an agreement on his part that he would faithfully discharge this duty. It forbade him to use them for his sole benefit or to prevent his principals from obtaining the object of the agency, and charged everything which he acquired by a violation of this inhibition with a constructive trust for their benefit.[8]

The court went on to note that it made no difference that the agency had terminated before Comstock himself bought the land.

> The duty of an attorney to be true to his client, or of an agent to be faithful to his principal, does not cease when the employment ends, and it cannot be renounced at will by the termination of the relation. It is as sacred and inviolable after as before the expiration of its term. Eoff v. Irvine, 108 Mo. 378, 383, 18 S.W. 907, 32 Am.St.Rep. 609; Robb v. Green [1895], 2 Q.B. 315, 317–320; Louis v. Smellie (1895), 73 Law Times (N.S.) 226, 228.[9]

In short, the court held that Comstock "was prohibited from using the information and advantages he had secured by means of his agency to prevent or hinder his principals from accomplishing the purpose of the agency."[10] The doctrine would apply with equal force to the case of Colquhoun, who first learned about and became interested in NRA and SARA as a direct result of, and in connection with, his employment by Group Association Plans, Inc.

To the same effect as Trice v. Comstock is Byrne, et al. v. Barrett,[11] another case involving a real estate transaction, this time a broker's agent who left the employ of the broker and proceeded to complete on his own behalf (after he had acquired his own brokerage license) a transaction on which he had begun negotiations on behalf of his employer. The New York Court of Appeals noted that it was unnecessary to find any evidence of fraud or bad faith on the part of the defendant, but that the essential fact was that "the negotiations prior to defendant's resignation, and consummated thereafter, constituted a continuous transaction. . . ."[12]

The *Byrne* court remarked that "[t]he essential point to be borne in mind is that the duty of an agent or employee not to use confidential knowledge acquired in his employment in competition with his principal is implicit in the relation," and then proceeded to find that "[i]t is clear enough that the defendant's knowledge of the status of negotiations was acquired solely in the course of his agency and that it was confidential and special rather than public or general; 'something known only to one or a few and kept from

---

8. 121 F., at 624.

9. 121 F., at 625.

10. 121 F., at 625–626.

11. 268 N.Y. 199, 197 N.E. 217 (1935). *See also* Fidelity Appraisal Co. v. Federal Appraisal Co., 217 Cal. 307, 18 P. 2d 950 (1933) (en banc, Judge Seawell for the court) (not fair or equitable for former employee to reopen negotiations with prospective customers on behalf of new employer until reasonable time after resignation has elapsed); Nye v. Lovelace, 228 F.2d 599, 603 (5th Cir., 1956) (Judge Brown) (agent who capitalized on information that had come to him in the course of his position of trust for his own gain must restore to principal his personal gain).

12. 268 N.Y., at 206, 197 N.E., at 218.

others.' "[13] Thus the court held the former employee liable for a breach of his common law duty to his former employer, a holding which may be applicable to the case at bar.

■■ In this court R. K. Tongue has argued against the imposition of this common law doctrine, on the basis that there is another common law doctrine that permits an employee to compete with his former employer absent an express contractual provision to the contrary.[14] R. K. Tongue is, of course, right about the existence of a common law right to compete, and even about the existence of a right to "steal" clients absent a contractual relation to the contrary. It is nonetheless true that these two common law doctrines, the doctrine of duty to a former employer and the doctrine of freedom to compete absent contractual duties to the contrary, are not mutually inconsistent. The doctrine of duty to a former employer, relied on by Judge Holtzoff and discussed here, goes to those instances where an employee, with the use of information acquired through his former employment relationship, completes, for his own benefit, a transaction originally undertaken on the former employer's behalf. In the cases that espouse this doctrine, *e. g., Byrne*, what is important is what might be characterized as an incomplete transaction, which the employee appropriates to his own benefit.

■ If, on the remand of this case, the trial court decides that the record shows that Colquhoun completed negotiations which he had started on behalf of his former employer GAP for his own benefit (through benefiting his new employer), then the District Judge, as did Judge Holtzoff, may find that Colquhoun breached his common law duty to his former employer.

Having stated all of this with regard to Colquhoun's possible common law liability, we emphasize that the trial court is free, on this remand, to decide that there is liability on the contract in addition to, or in place of, any common law liability of Colquhoun. Without prejudging the issue in any way, we point out that whether the term "customers" in the non-competition clause of the contract included "prospective customers," such as NRA and SARA, has not been decided. Relevant thereto would be how the term was construed by Colquhoun and Group Association Plans, Inc., when they entered into the contract, or how the industry in general customarily interpreted similar terms.[15]

### V. The Damages Issue

Group Association Plans, Inc., has raised a number of questions involving the monetary damages determined by the deputy auditor. On remand these issues may be put before the new District Judge, who will again have to determine whether the findings of the deputy auditor were correct. These are issues which may be resolved upon the record if possible, or by a new trial if necessary.

Without making all of the determinations necessary on the question of damages, there are two points which deserve comment.

■ The first is the objection that R. K. Tongue makes to the deputy auditor's use of the ten-year period of the non-competition clause as a reference for figuring damages from lost profits.[16] We

---

13. *Ibid.*

14. *See* Brief for Appellant R. K. Tongue, at 32. *See also* Aetna Casualty and Surety Co. v. Lee, 97 U.S.App.D.C. 213, 229 F.2d 787, cert. denied, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956).

15. *See* Meeker v. Stuart, 188 F.Supp. 272 (D.D.C., 1960) ; Annot., 165 A.L.R. 1471, 1475 (1946).

16. Brief for Appellant R. K. Tongue, at 41–42.

do not agree with R. K. Tongue's assertion that damages may not be predicated upon a projection of future profits,[17] and hold that such damages are proper, although "they are dependent on what [was] accomplished during the period prior to cancellation."[18] We are not able to say, however, that the ten-year figure is proper, and direct that the District Court determine whether the ten-year period is a reasonable one.

 Second, we agree with appellant R. K. Tongue that it was improper for the auditor to disallow certain commission expenses paid and payable to Colquhoun and others on the NRA and SARA accounts.[19] Since R. K. Tongue was and is legally obligated to pay such commissions so long as it continues to service the accounts involved, as to R. K. Tongue these commissions *are* expenses, and to appellee GAP *would be* expenses; hence, they must be subtracted from any figure for lost profits.

As to the other expenses which R. K. Tongue claims were wrongfully disallowed by the auditor, we make no comment, and leave these questions for resolution by the District Judge.

On either of the major issues discussed above, if the District Judge can make a decision on the existing record, he may do so. If additional evidence is deemed necessary on any issue, then we think a new trial on that particular issue is preferable to an attempt to supplement the record. For proceedings not inconsistent with this opinion, the judgment is vacated, and the case is

Remanded.

---

17. *Ibid.*

18. Schenstrom v. Continental Machines, Inc., 85 F.Supp. 374, 381 (D.Minn., 1949). *See also*, Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Calkins v. F. W. Woolworth Co., 27 F.2d 314, 320 (8th Cir.), cert. denied, 278 U.S. 645, 49 S.Ct. 80, 73 L.Ed. 558 (1928); Lawless, "Computation of Future Damages: A View from the Bench," 54 Geo.L.J. 1131 (1966).

19. Brief for Appellant R. K. Tongue, at 45–46.